No. 46,945

PHILLIPS AND EASTON SUPPLY CO., INC., *Appellee*, v. ELEANOR INTERNATIONAL, INC., *Appellant*.

(512 P. 2d 879)

Opinion filed July 14, 1973.

*Robert Kamas*, of Render, Kamas & Kelly, of Wichita, argued the cause and was on the brief for the appellant.

*Thomas Triplett*, of Martin, Pringle, Schell & Fair, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: This action was brought for specific performance of a contract to purchase a commercial building and lease it back to the vendor under a long term lease arrangement and in the alternative for damages for breach of the contract. The case was tried to the court, specific performance was denied but a judgment

for damages was entered in the amount of $62,040.00. The defendant appeals from that judgment.

Plaintiff Phillips and Easton Supply Co., Inc. (Phillips) owned the commercial building in question and conducted its business therefrom. Phillips is a corporation owned and managed by Donald M. Joseph as president and majority stockholder. Joseph acquired the company in 1970 through a real estate broker by the name of Clarence Offenstein. The building which housed Phillips was subject to a small business administration loan slightly in excess of $48,000.00 and in the fall of 1971 the business was experiencing some financial difficulties from lack of operating capital.

Defendant Eleanor International, Inc. (Eleanor) is a real estate investor corporation organized in 1971 by John Sowers and Paul Polishuk. Sowers and Polishuk owned all of the stock of the corporation. They arranged with Isaac N. Goodvin, as agent, to package real estate acquisitions under agreements to purchase commercial buildings from businesses such as Phillips and lease them back to the respective vendors under long term lease-back agreements.

Offenstein, the real estate broker, and Goodvin, the agent of Eleanor, had previously worked together on a purchase and lease back of another business in Wichita for Eleanor. They decided to pool their efforts and arrange such a deal between Phillips and Eleanor. Offenstein talked with Joseph and Goodvin talked with Sowers and Polishuk. Interest in such a transaction was indicated by both parties and on September 29, 1971, Offenstein composed a letter addressed to Eleanor, which letter was signed by Joseph, whereby Phillips offered to sell its building to Eleanor free of all liens for $190,000.00 cash. The letter suggested a proposed lease back arrangement for a term of fifteen years with two ten year options of renewal at an annual rental of 12% "net net net" based on the purchase price. The letter stated that the offer would remain open for five days from its date. A space was provided at the bottom for an acceptance of the offer to be signed by an officer of Eleanor.

This letter was hand delivered by Offenstein. Thereafter Polishuk, Goodvin and Offenstein discussed its contents and certain changes were suggested by Goodvin and Polishuk. Offenstein telephoned Joseph from Eleanor's offices and outlined the proposed changes. Joseph indicated these changes would be agreeable. Thereafter a letter was prepared in Eleanor's offices on Eleanor's stationery and given to Offenstein for hand delivery to Joseph. The letter was

dated October 7, 1971, and was addressed to Phillips for the attention of Joseph. The body of the letter reads as follows:

"In responce to your letter dated September 29, 1971, we wish to recommend two changes. We are counterproposing a sale price of $180,000.00 and we also request a change be made in the option terms of the lease to include only one 5-year term.

"Upon agreement of the above terms, Eleanor International will provide Escrow and Lease documents for the approval of the Board of Directors of both parties. If you have any additional questions concerning this proposal, please feel free to contact me at the above number.

Sincerely,

[SIGNED]                                        Isaac Goodvin

After the letter was hand delivered to Joseph, the following acceptance was typed at the end of the letter and signed by Joseph:

"Accepted this 7th day of October, 1971 with the understanding that closing will be effected by October 29, 1971, unless extended by mutual agreement.

Phillips & Easton Supply Company<br>By<br>D. M. Joseph, President"

The letter with the acceptance was returned to Eleanor's offices by Offenstein. The language of the acceptance was noted and no objection was made. A few days thereafter Goodvin prepared a leaseback agreement between Eleanor, as lessor, and Phillips, as lessee.

The lease-back agreement was a comprehensive written instrument and covers ten pages of the record on appeal. It provides for a leasehold term of fifteen years, an option by the lessee to renew for an additional five years, a monthly rental of $1,800.00 (which would amout to a net annual rental of 12% of the $180,000.00 sale price, a provision for repairs and alterations at the expense of the lessee, a provision for assignment or sublease subject to the approval of lessor, a provision requiring certain insurance and taxes to be paid by lessee (no mention of lease guarantee insurance was made therein), a provision for remedies of the lessor in case of default by or insolvency of the lessee, an eminent domain provision and a miscellaneous provision further defining the corresponding rights and liabilities of the parties.

This lease agreement was delivered to Joseph for his approval. Joseph had the lease reviewed by his attorney and by an insurance agent. Thereafter Joseph obtained an acceptance of terms of the lease from the board of directors of Phillips and informed Offenstein that the lease agreement was acceptable as written. Offen-

stein relayed word of the verbal acceptance to Goodvin. At this point in time Goodvin met with Joseph and indicated there were no problems with closing the transaction on October 29, as contemplated by the letter of October 7.

Apparently Eleanor needed suitable bank financing to pay for the property and the bank required security in the form of a mortgage on the Phillips property and a policy of insurance to guarantee the rental payments under the long term lease. This type of insurance is referred to as lease guarantee insurance. So Goodvin as agent for Eleanor went to Joseph with the necessary application forms to apply for the lease guarantee insurance. Joseph asked why this application was needed and Goodvin advised him that Eleanor was applying for lease guarantee insurance and Eleanor would pay for the policy charge. The information necessary to complete the application was given by Joseph and he signed the application at the request of Goodvin. This was the first time that lease guarantee insurance had been mentioned by the parties. It was not a requirement in the letter and acceptance of October 7, and it was not included with the other types of insurance required in the lease agreement submitted by Eleanor and approved by Phillips.

During the latter part of October in preparation for closing Joseph obtained a release of the small business administration loan covering the Phillips property. On October 29 Joseph telephoned Goodvin and was informed that there would be some delay in closing because Goodvin had to be out of town. Joseph was told that Polishuk would take over the closing. Later Joseph made a series of telephone calls to contact Sowers and Polishuk. They were unavailable and did not respond to these calls but on November 21, Polishuk wrote a letter to Joseph on Eleanor stationery. The body of the letter reads as follows:

"I am dictating this letter to you on Sunday morning, realizing that you made many telephone calls, trying to reach me yesterday. Please understand that I was not able to take the calls because of other commitments, not disinterest or negligence.

"With Mr. Goodvin in the hospital, I have had to take over many obligations and responsibilities. I am attempting to finalize the banking aspect of our purchase and wish of you to be as patient as possible. I fully realize the need for the funds and promise to conclude this as quickly as possible.

"I have postponed a business trip to Europe because of small acquisitions in Wichita that I am presently trying to complete. I will inform you as soon as possible when we are ready to go to the bank. I will call you on this, this week. Accept again my apologies for the delay. Hope business is good!"

Several days after this letter was mailed a meeting was arranged among Joseph, Offenstein and Polishuk. Polishuk then advised Joseph that Eleanor wanted out of the deal because of the financial weakness of Phillips. Eleanor, apparently, was not able to obtain lease guarantee insurance on the lease-back to Phillips and without the insurance could not obtain bank financing on the purchase. Thereafter Joseph began soliciting other offers for purchase and lease-back of the Phillips property.

This action was filed. It was tried to the court and resulted in a judgment against Eleanor in the amount of $62,040.00 from which the present appeal is taken. Three points are urged on appeal (1) no contract, (2) exclusion of evidence, and (3) erroneous measure of damages. We will consider these points in that order.

Appellant-Eleanor contends the evidence was insufficient to establish a binding contract, in that there was no meeting of the minds of all the parties on all essential and material terms. The main thrust of that argument is directed to the last paragraph of the letter of October 7, where it was stated, "Eleanor International will provide Escrow and Lease documents for the approval of the Board of Directors of both parties". It is argued that no complete and binding agreement was contemplated by the parties until all final papers were signed and that the letter of October 7 was merely an offer for further negotiations toward a final complete agreement.

In order for parties to form a binding contract, there must be a meeting of the minds as to all the essential terms thereof. (*Topeka Savings Association v. Beck,* 199 Kan. 272, Syl. ¶ 2, 428 P. 2d 779; *Weil & Associates v. Urban Renewal Agency,* 206 Kan. 405, Syl. ¶ 4, 479 P. 2d 875; *Hiniger v. Judy,* 194 Kan. 155, 398 P. 2d 305; *In re Estate of Rogers,* 184 Kan. 24, 334 P. 2d 830; *Stapleton v. Hartman,* 174 Kan. 468, 257 P. 2d 113.) Generally, an agreement to make a contract in the future is not binding unless all the essential terms and conditions are agreed upon and nothing essential to complete it is left to future negotiations. (*Weil & Associates v. Urban Renewal Agency,* supra, Syl. ¶ 5; *Railroad Co. v. Gorman,* 79 Kan. 643, 100 Pac. 647.)

In 1 Corbin on Contracts, § 29, p. 82, it is stated:

"Communications that include mutual expressions of agreement may fail to consummate a contract for the reason that they are not complete, some essential term not having been included.

"Frequently agreements are arrived at piecemeal, different terms and items being discussed and agreed upon separately. As long as the parties know that there is an essential term not yet agreed on, there is no contract; . . ."

This court has upheld findings of a trial court that communications between parties were insufficient to constitute a contract where the evidence showed no contract was intended to be made until a more formal instrument embodying all the terms was executed. In *Weil & Associates v. Urban Renewal Agency*, supra, the court held:

"Where the intent of the parties is clear that they are negotiating with a definite understanding the terms of any contract are not fully agreed upon and a written formal agreement is contemplated, and no valid, enforceable contract is to exist until the execution of such an agreement, a binding contract does not come into existence in the absence of such execution." (206 Kan. 405, Syl. ¶ 6.)

To the same effect, see *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, 500 P. 2d 39; 1 Corbin on Contracts, § 30, p. 97.

However, people sometimes do business in an informal fashion, using abbreviated elliptical language, clear to the contracting parties but somewhat obscure to an outsider, for instance in the present case the term "net net net". An agreement or transaction between contracting parties is binding when the parties mean it to be so and the proper interpretations of their expressions and actions must be determined as questions of fact. Certain matters may be expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement. Such an expectation will not prevent an agreement already made from being an enforceable contract. This may be true even though they expressly provide in their agreement that new matters, when agreed upon, shall be incorporated into their agreement and all shall be reduced to a formal written document or documents later. (1 Corbin on Contracts, § 29, p. 95.) The fact that the parties contemplate the subsequent execution of a formal instrument as evidence of their agreement does not necessarily imply they have not already bound themselves to a definite and enforceable contract. *(Willey v. Goulding*, 99 Kan. 323, 161 Pac. 611; *Middleton v. City of Emporia*, 106 Kan. 107, 186 Pac. 981.)

In 1 Corbin on Contracts, § 30, p. 98, it is said:

"The courts are quite agreed upon general principles. The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court that they intended to be bound without a formal document, their

contract is consummated, and the expected formal document will be nothing more than a memorial of that contract. In very many cases the court has been convinced that such was the intention and has held the parties bound by a contract even though no document has been executed. . . ."

In the present case there is no doubt the parties contemplated execution at a later time of formal documents to be handled through a bank, such as a sale contract or escrow agreement pending title clearance, a deed of conveyance and the lease-back agreement. The letters of the parties and the written acceptance endorsed on the letter of October 7, called for a cash sale of the property at a stated price free and clear of encumbrances. An ordinary deed of conveyance is not subject to much question as to its terms. The lease-back agreement had previously been meticulously prepared by Eleanor and was approved by Phillips. The actions of the parties were consistent with an intention to be bound. Phillips obtained a release of the small business administration mortgage in order to comply with the expressed requirement of clear title. Eleanor prepared and submitted the lease agreement and in its letter of November 21, stated, "I am attempting to finalize the banking aspect of our purchase and wish of you to be as patient as possible." There was no mention of the lease guarantee insurance in the prior negotiations, or in the letters and the lease. When Goodvin procured Joseph's signature on the lease guarantee insurance application he did not state that the insurance was a prerequisite to a binding contract. Eleanor was to bear the cost, it was for Eleanor's protection and Joseph's signature on the application could very well be interpreted by the trial court as a gratuitous act for the purpose of assisting Eleanor with its plans for financing its purchase through the bank. It seems clear the purchase and sale agreement was not conditioned upon Eleanor first obtaining necessary financing and such was not an essential element of the parties' original agreement.

In *Wallerius v. Hare*, 200 Kan. 578, 438 P. 2d 65, it was held:

"When a positive acceptance is unequivocally made an inquiry or request will not invalidate the positive acceptance. The effect of a binding contract is not destroyed by post-contractual discussion which might lead to concessions but only as a matter of grace upon one side or the other." (Syl. ¶ 2.)

Assuming that the essentials of a contract are agreed on the controlling question of whether a binding contract was entered into depends upon the intention of the parties and is a question of fact. (*Short v. Sunflower Plastic Pipe, Inc.*, supra.) The question was

one for the trial court to resolve and there is sufficient evidence to support the trial court's finding that the parties intended to be bound by the written agreement of October 7, 1971, without formal documents. This court must accept that finding. A trial court's findings of fact may not be overturned unless clearly erroneous, due regard being given to its opportunity to consider the credibility of the witnesses (K. S. A. 60-252 [a]).

Eleanor next argues that Phillips' assent to its October 7 proposal was conditional in that it added as a new proposed term the October 29 closing date and was thus not an effective acceptance. It is elementary that an acceptance of an offer must be unconditional and a purported acceptance imposing new or varied terms is not effective as an acceptance and is merely a counter-offer. (See *Wiggam v. Shouse*, 105 Kan. 637, 185 Pac. 896; *Belden Mfg. Co. v. Curtis-Wright Airplane Co.*, 137 Kan. 840, 22 P. 2d 494; 1 Corbin on Contracts, § 82, p. 349.) Even assuming the addition of Joseph's "understanding" that the deal would be closed by October 29 renders the acceptance conditional, the record clearly supports a finding that Goodvin, on behalf of Eleanor, assented to the October 29 closing date and this was later extended by mutual agreement. The trial court's finding cannot be attacked on this basis.

Eleanor cites this court's pronouncement in *Sinclair Prairie Oil Co. v. Worcester*, 163 Kan. 540, 183 P.2d 947, that equitable relief may be refused if a contract is unfair, or if its enforcement will cause unreasonable or disproportionate hardship. This principle can have no application to this appeal. The trial court refused to grant specific performance. The equitable principles of the *Worcester* case do not apply to an award of damages for breach of contract. If it is found that Eleanor entered into the contract, there is nothing inequitable in requiring it to pay damages which arose from a breach of that contract.

Eleanor next claims error in the refusal of the trial court to admit into evidence defendant's proffered exhibits No. 1 and 7 which were the rough draft and typed copy of the application for loan guarantee insurance. It contends the exhibits would show that Phillips knew or should have known that the negotiations were dependent upon procuring such insurance. Such a conclusion does not necessarily flow from the execution of the application. It is unclear from the record why the exhibits were excluded. Nevertheless, the record reflects that all oral testimony relating to the application for lease guarantee insurance, including Joseph's furnishing of information

therefor, was admitted into evidence without objection. The precise contents of the application were not relevant to this litigation and the fact such insurance was sought by Eleanor was not in dispute. In view of the oral testimony the exclusion of these exhibits could not have been prejudicial error. On appeal, this court must disregard all technical errors which do not prejudice the substantial rights of the party complaining. (K. S. A. 60-2105.)

Appellant's final claim of error relates to the amount or measure of damages awarded. The amount originally prayed for in the petition was $50,000.00. Although the record fails to disclose an amendment to the prayer for damages, we were advised on oral argument that the award of $62,040.00 was discussed by the parties and the trial court orally permitted amendment to cover the total award as provided in K. S. A. 1972 Supp. 60-215 (*b*).

The main thrust of appellant's argument as to damages is directed at the insufficiency of the evidence to support the judgment. The measure of damages recoverable for a breach of contract is limited to such as may fairly be considered as arising in the usual course of things from the breach itself, or as may reasonably be assumed to have been within the contemplation of the parties as the probable result of such a breach. (*Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 501, 413 P. 2d 98; *Cain Shoes, Inc. v. Gunn*, 194 Kan. 381, 383, 399 P. 2d 831.) The evidence allowed to support damages for breach of contract is the best evidence obtainable under the circumstances of the case to show the natural and ordinary consequences of the breach and which will enable the court or the jury to arrive at a reasonable estimate of the loss which resulted. (*Gartner v. Missimer*, 178 Kan. 566, 570, 290 P. 2d 827; *Vanguard Insurance Company v. Connett*, 270 F. 2d 868 [10th CA].)

In the present case appellee-Phillips introduced in evidence without objection a prospective offer of a somewhat similar sale and lease-back agreement on this same commercial building which it had solicited from another real estate investor corporation. The evidence introduced was in the form of a proposed written real estate purchase contract by the Graham-Michaelis Company. The purchase price offered was $170,000.00 in place of the Eleanor contract price of $180,000.00. The lease-back agreement proposed by Graham-Michaelis was similar as to terms and conditions except for a monthly rent which was to be $2,034.05 in place of the Eleanor lease rental of $1,800.00 per month. In addition there was a written requirement that lease guarantee insurance be obtained and the

application fee be paid by Phillips, subject to a 50% repayment by Graham-Michaelis if and when the sale and lease-back was completed. The record contains no showing that this lease guarantee insurance was ever applied for or that the amount of the application fee to be paid by Phillips was ever determined.

The trial court in its findings did not indicate how its award of $62,040.00 damages was measured. The appellant-Eleanor attaches to its appeal brief a full copy of the appellee's trial brief which was submitted to the trial court. In this trial brief appellee-Phillips suggested, on the basis of the Graham-Michaelis proposal, it had been damaged in the following sums: $10,000.00 for the decrease in sale price, $42,120.00 for the increased rents and $10,000.00 for the cost of the lease guarantee insurance. The slight variance between the total of these figures and the court's final award is not explained. The appellee-Phillips on appeal relies for evidence of damages on the differences between the Graham-Michaelis offer and the contract in controversy. No question was raised below or here which indicates that the Graham-Michaelis offer was not a good faith legitimate offer. Because of the unusual nature of the transaction in controversy such a comparison would appear to be the best evidence obtainable under the circumstances of the case to show the natural and ordinary consequences of the breach by Eleanor. We have carefully reviewed the evidence in the record which includes plaintiff's exhibit No. 6, consisting of copies of the instruments constituting the Graham-Michaelis offer. However, we find no evidence to support $10,000.00 of the award allowed by the trial court for the added cost of lease guarantee insurance on the Graham-Michaelis offer.

It has been suggested that this figure on the added cost of lease guarantee insurance might be taken from defendant's exhibits 1 and 7, which are copies of the application for lease guarantee insurance signed by Joseph at the request of Goodvin. These two exhibits were never received in evidence. But assuming they should have been, the application does not relate to the Graham-Michaelis lease and does not reflect the cost of such insurance on the Graham-Michaelis lease. The record is entirely silent on the subject of rates generally paid on lease guarantee insurance. There was no oral testimony on the subject. There was but a single reference in the application that a fee *not in excess* of 2.8% of the guaranteed rent under the proposed lease between Eleanor and Phillips be paid. We note that this percentage was not definitely

fixed on the Eleanor-Phillips transaction and such an indefinite percentage cannot be reasonably engrafted on the Graham-Michaelis transaction in the absence of some testimony that these were the usual and customary charges. To the extent of the $10,000.00 allowed for the cost of lease guarantee insurance the award of damages fails for lack of supporting evidence.

In summary we hold that the trial court's finding that a binding agreement was entered into by the parties on October 7, 1971, should be upheld, that the exclusion of the proffered exhibits did not constitute prejudicial error and that the court's judgment awarding damages should be and the same is hereby modified by reducing the amount of the total award to $52,040.00. In all other particulars the judgment is affirmed.