No. 13291

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

ERIC MYHRE,

Plaintiff and Respondent,

-vs-

THOR MYHRE and GERTRUDE MYHRE,

Defendants and Appellants.

---

Appeal from:    District Court of the Eighth Judicial District,
                Honorable Paul G. Hatfield, Judge presiding.

Counsel of Record:

For Appellants:

Anderson, Symmes, Forbes, Peete and Brown, Billings,
Montana
Raymond K. Peete argued, Billings, Montana
Robert Gabriel appeared, Great Falls, Montana

For Respondent:

Hutton, Sheehy and Cromley, Billings, Montana
John C. Sheehy appeared, Billings, Montana
James, Sogard & Fopp, Great Falls, Montana
Bruce A. MacKenzie argued and Ted James appeared,
Billings, Montana

---

Submitted:  June 1, 1976

Decided: SEP 1 1976

Filed: SEP 1 1976

*Thomas J. Kearney*

---

Clerk

Hon. Gordon Bennett, District Judge, sitting in place of Mr. Justice John Conway Harrison, delivered the Opinion of the Court.

This is an appeal by defendants from a judgment entered in the district court in Cascade County. Plaintiff cross-appealed from a portion of the judgment as will hereinafter be developed.

Appellants ask reversal of a judgment directing appellant Gertrude Myhre to specifically perform her agreement to transfer 407 shares of stock in an advertising company to her son, the respondent; directing appellant Thor Myhre to transfer 108 shares of company stock to his wife, appellant Gertrude Myhre; enjoining Thor Myhre from removing his son, respondent, as vice president of the company; granting respondent a money judgment against his father for damages occasioned by the father's removal of the son from the vice presidency; restraining appellants from specified activities related to the corporation and awarding costs against appellants. In a cross-appeal, respondent asks reversal of a part of the judgment that directs all parties to carry out a retirement plan for appellant Thor Myhre approved by the company board of directors.

The court found that Myhre Advertising was a Montana corporation, the stock ownership of which was largely in the Myhre family. On July 1, 1968, appellants had an argument in their Billings home. He accused her of marrying him for his money. Angered and confused as to her own intentions with regard to the transfer of ownership, she took certificate No. 10 of the corporation, representing 108 shares of stock, from the family safe, endorsed it over to him and handed it to him. He laid it on a nearby table and apparently did not give the matter further consideration at that time. A few days later she returned the certificate to the family safe, where it remained until December 30, 1970.

He did not present the certificate for transfer on the

corporation books, nor did he ask his wife, as corporation secretary, to do so. No consideration was tendered or accepted for the endorsement. No federal gift tax return was filed with respect to the purported transfer. The corporate records show a cancellation of the certificate on December 30, 1970, and the transfer of the 108 shares of stock, by new certificates, to appellants' four children and to Mrs. Myhre, who received a certificate for 38 shares. The face of certificate No. 10, which remains in the corporate records, shows Mrs. Myhre's notation: "Cancelled 12/30/70." The word "Cancelled", without date, is written across the endorsement to Thor Myhre on the reverse side. Appellants made gift tax returns showing the transfers to the children in the calendar year 1970. The corporate records between December 30, 1970, and June 6, 1974, reflect the transfer made on the former date. The minutes of subsequent stockholders' meetings, signed by both appellants, show stock ownership, for voting purposes, based on the 1970 transfer.

At their July 3, 1972 meeting, the board of directors discussed and approved "the legal intent" of a future compensation and retirement plan for Thor Myhre. The pertinent facts as disclosed by the record will be more fully detailed at a later point in this opinion.

On April 30, 1973, plaintiff and his mother, the appellant Gertrude Myhre, signed an option agreement wherein she agreed to transfer to him 407 shares of the corporation's stock upon his exercise of the option. The signing was in the presence of her attorney, who notarized it June 30, 1973. On July 11, 1973, the attorney, who had retained possession of the document, delivered it to the plaintiff, having been authorized to do so by Gertrude, who had received valuable consideration in the form of a $50 payment from plaintiff. At the time she signed the agreement and

- 3 -

had it delivered she was fully knowledgeable as to its provisions. She had conferred with a banker about some of its principle terms. She had also conferred with her lawyer. She was fully competent mentally and acted without reservation, hesitation or question. There was no showing of undue influence or duress.

On August 1, 1973, Thor filed for a divorce from Gertrude. On December 11, 1973, during the pendency of the divorce proceedings and three years after the cancellation of certificate No. 10 and the distribution of the 108 shares represented thereby, Thor made written demand upon Gertrude for the transfer to him of the 108 shares on the basis of the 1968 endorsement. Gertrude's attorney advised her the purported transfer by endorsement was invalid and unenforceable. The demand was rejected.

May 29, 30 and 31, 1974, were busy days for the Myhre's. On May 29, Eric, through counsel, wrote Gertrude's attorney a letter, with a copy to Gertrude, advising he exercised his option to purchase 407 shares of company stock and enclosed a cashier's check for $5,000 and a promissory note for the balance, all in accordance with the April 30, 1973, agreement. Gertrude's attorney received these documents the following day and Gertrude received her copy on the 31st. On the 30th the appellants had met without counsel and agreed in writing to the transfer by Gertrude of 108 of her shares in the company to Thor as part of the divorce property settlement agreement, and Thor had agreed to hold her harmless for any suits or actions arising out of the transfer. The agreement was effectuated on June 6, 1974, six days after Gertrude had received notice of Eric's exercise of his option, by cancellation of stock certificate No. 3, held by Gertrude and representing 407 shares (the exact number for which Eric held an option to purchase) and issuance of two new certificates: No. 33 for 108 shares to Thor and No. 34 for 299 shares to Gertrude.

- 4 -

The transfer was made on the corporate books the same day, June 6th, and the new certificates were signed by Thor and Gertrude as corporate officers. At the time of the transfer agreement and its implementation both appellants were aware of the stock option agreement and that the transfer made it impossible for Gertrude to carry it out. At all times since May 29, 1974, Eric has offered to carry out his part of the option agreement and Gertrude has refused to carry out hers. The 407 shares of stock withheld by Gertrude, together with other shares he now holds, would give Eric over 51 percent of the corporation's stock, or effective stockholder control.

On October 23, 1974, Thor, being president of the company, fired Eric as an employee, removed him from his duties and cut and finally eliminated his salary and perquisites. Eric at that time was also an officer of the company, a vice president, and the company bylaws provide that officers or agents may be removed by board action only. In dismissing Eric, Thor acted on his own and without any official action on the part of the board.

These facts give rise to several principal questions, the first of which is whether the purported 1968 transfer of 108 shares of company stock from Gertrude to Thor Myhre was valid and enforceable. All parties recite Baird v. Baird, 125 Mont. 122, 134, 232 P.2d 348, as their respective gospels and agree it lays the ground rules for our consideration. That case holds, inter alia, that a transfer between spouses is presumed to be a gift, absent consideration. It is said there that to overcome the presumption the evidence must be " * * * clear, convincing and practically free from doubt. * * *" Finally, the case sets forth the horn-book requirements for a gift: delivery, donative intent and acceptance. (See also Detra v. Bartoletti, 150 Mont. 210, 433 P.2d 485.)

The testimony given at trial leaves little doubt that

there was physical delivery and acceptance. Gertrude endorsed certificate No. 10, handed it to Thor and he took it into his hand. But what of the accompanying donative intent? The expert on this matter should be the purported donor, Gertrude. Her pivotal testimony left the matter in serious doubt:

"Q. And what did you do with the certificate at that time, that is, when you had it in your physical possession? A. I signed it on the back, over to him, and gave it to him.

"Q. And by 'over to him,' did you show him as assignee of that stock? A. Yes.

"Q. And will you tell us what your purpose was at that time in giving it to him? A. Well, we had had an argument, and I was mad.

"Q. Is it fair to say that you wanted to settle a bone of contention as between the two of you at that point, by giving him the stock? A. Oh, I don't really know. It was just an argument, and it was a spur of the moment thing that I did, when I was just mad.

" * * *

"Q. Were you trying to make peace with him? A. You might say that.

"Q. And was it your intention at that time to give him absolutely and completely the ownership of Stock Certificate No. 10? A. Well, I don't know. As I say, I just did it was a spur of the moment kind of thing, and argumentative manner, and I did it, and I just forgot about it afterwards.

"Q. You did, in effect, deliver the stock to him, is that right? A. Yes.

"Q. You signed it over to him, and you delivered it to him? A. Yes, I did."

But subsequent occurrences unquestionably gave the court substantial grounds for concluding that the presumption was overthrown clearly, convincingly and practically free from doubt. One fact is particularly compelling. Two and a half years after the purported transfer of certificate No. 10 to Thor Myhre, that certificate was cancelled on its face and on the books of the corporation and five new certificates representing the same 108 shares

of stock were issued to the four children (70 shares in all) and to Mrs. Myhre (38 shares). One might discount this on the grounds, urged by appellants, that Mrs. Myhre kept the corporate records and Thor Myhre was not aware of them. However, on the same day, Thor Myhre's certificate No. 11, representing 109 shares was similarly cancelled and new certificates were issued in the same manner to the children and Thor Myhre. This, together with the subsequent filing of joint gift tax returns and the voting of the stock in accordance with the new distribution, is highly persuasive evidence that both appellants understood the July 1, 1968, transaction was a nullity for lack of any real intention on the part of either that title was to pass. There being substantial evidence to support the determination of the court that the purported gift was incomplete, we must sustain that determination.

The second principal question is whether the option agreement of April 30, 1973, between Eric and his mother, Gertrude, for the transfer of 407 of her shares of company stock is valid and enforceable by specific performance. The facts in this regard, set out above, leave little room for doubt that there was a valid, subsisting contract at the inception; Eric performed according to the terms of the contract, and his mother refused to. The requirements of basic contract law were met, there was mutual assent, or the "meeting of minds", and consideration. There were three conditions in the option: annual payments, written notice of acceptance, and tender of a specified down payment within a set time. All conditions were satisfactorily met, insofar as Eric was able to do so. The first annual payment was made. It became futile to make additional annual payments when Gertrude refused to perform. The original notice of acceptance was sent to Gertrude's attorney, who should be viewed as

her agent, and a copy went to Gertrude; the specified down payment was not only tendered but accepted within the required time.

In subsequent actions and appearances before this Court, we have been made aware of the fact that subsequent to this appeal Gertrude has now confirmed and acted on the option agreement to Eric.

Appellants urge five grounds for invalidity are: (1) undue influence, (2) unconscionability, (3) impossibility due to a restraining order issued in connection with the divorce, (4) Eric's lack of sufficient funds to carry out the contract, and (5) Gertrude's inability to deliver because of the 1968 transfer of 108 shares of stock to Thor. All lack merit. Grounds (1) and (2) are not clearly supported by the record and the district court had ample substantial evidence to arrive at a contrary conclusion. The restraining order might have inhibited the transfer during the pendency of the divorce, but it could not prohibit Gertrude from entering into the option agreement, nor from transferring the optioned stock once the restraining order was lifted. The lack of funds argument was not proven factually, nor can it be sustained legally as a reason for refusal to perform on a contract, unless such lack of funds results in actual nonperformance. Finally, we have concluded above, as the district court did, that the purported transfer of 108 shares in 1968 was invalid. Furthermore, even if the transfer was valid, it would not relieve Gertrude of her liability to transfer as many shares as she could in fulfillment of the option agreement.

As pointed out by defendants, the granting of specific performance is discretionary with the court. See Babcock v. Engel, 58 Mont. 597, 194 P. 137. The district court has ordered specific performance of the option agreement and, based on the facts in this case, we find no abuse of discretion. Clearly the

awarding of damages would not have been appropriate because they would not have been ascertainable without the wildest speculation. The stock in question had no recognized market value. Its value will depend on the performance of the company in a highly competitive field. Acquisition of the stock will, it appears, give Eric Myhre operating control of the company. This is a highly intangible factor contingent upon innumerable and indeterminate events. Given these circumstances, or lack of definable circumstances, it would seem to have been an abuse of discretion on the part of the court to fail to decree specific performance.

To implement the specific performance decree, the district court, at its own instance, directed Eric to deliver an executed agreement pledging the stock to be received under the option as security for full payment of the agreed-upon stock price. No objection to this requirement was raised on appeal, it was within the court's equitable powers to establish it, and it would appear to be an effective way to assure performance on the part of the plaintiff.

To further implement its specific performance order, the court also ordered Thor Myhre to do whatever was necessary to transfer back to Gertrude the 108 shares of company stock he acquired from her in the divorce settlement agreement of May 30, 1974. This would enable her to fulfill her commitment under the option agreement. Including Thor Myhre in the specific performance order seems appropriate in view of his involvement in the transaction calling forth the order. His inclusion seems to have legal sanction for two reasons: First, he knew of Gertrude's commitment under the option at the time the transfer was made to him. He knew that she could not meet that commitment without at least part of the 108 shares he had acquired from her. The

board, that ran from May 1, 1973 to April 30, 1974, but there is no evidence of renewal.

In his letter dismissing Eric from employment by the corporation, Thor made it clear he was not attempting to alter Eric's status as either a vice president or a member of the board. There is no evidence of a written contract or agreement between Eric and the board as to Eric's employment by the company. Uncontradicted testimony and pleadings by Eric establish he did not receive any compensation as vice president or director; he was employed as manager of the Great Falls office and in the year 1974 his salary was increased by Thor without board action. The whole record shows this was a closely held family corporation with Thor acting as head of the corporation as well as the family and carrying on the corporate operations pretty much as he wished with the approval of the board. Finally, the owners of a majority of the stock were aware of Thor's move, both before and after it was made, and they ratified it at the next board of directors meeting.

We conclude from this that Eric wore three hats viv-a-vis the corporation: he was a director, an officer and an employee. (As to divisibility of status, see 2 Fletcher Cyclopedia Corporations, Section 266, p. 15, PermEd., 1969. He was discharged as an employee and not as director or officer. As an employee, he had no enforceable contract of employment with the board. As president, acting for the chairman of the board, Thor Myhre had authority to hire and fire employees. His dismissal of Eric was informally approved at the time by directors with control of a majority of the corporation's stock and formally ratified at the next meeting of the board of directors. Where the directors of a corporation are the only stockholders, they may act for the corporation without formal meetings. Formal meetings can also be waived by custom or general consent,

rule seems to be that one who acquires or purchases property, knowing that the property is subject to a contract to be sold to another, may be compelled to perform the contract in the same manner and to the same extent as his grantor would have been liable to do had the grantor not made the transfer to him. Moore v. Crawford, 130 U.S. 122, 32 L.Ed. 878, 9 S.Ct. 447; 71 Am Jur 2d Specific Performance. Second, as noted above, the transfer agreement provided Eric would save Gertrude harmless from any action that might arise as a result of the agreement. This is that action.

It does not appear from the facts that it would be necessary to transfer the entire 108 shares back to Gertrude Myhre in order to fulfill her commitment to deliver 407 shares under the option. She had, in addition to the 407 shares in certificate No. 3, at least 38 shares from the distribution of certificate No. 10 on December 30, 1970. (See above.) Thus, it would seem the order of the district court should be modified to direct Thor Myhre to return to Gertrude Myhre a sufficient number of shares of company stock to meet her commitment under the option agreement with Eric Myhre.

The district court held, as a matter of law, that the plaintiff, Eric Myhre, could be relieved of his duties and salary from the corporation only by action of the Board of directors, that the bylaws of the corporation establish a contractural relationship between the officer and the corporation, and that Thor Myhre wrongfully removed Eric " * * * from the duties of his office in charge of sales * * *." On this basis, the court awarded damages against Thor Myhre for Eric's loss of wages and and permanently enjoined Thor from removing Eric " * * * from the duties of his office and position as vice president in charge of sales * * *."

When Thor fired Eric on October 23, 1974, he was president

of the corporation, having been elected as such at the July 2, 1974 board of directors meeting. At the same meeting, the board had adopted new bylaws, which provided for a chairman of the board who was to be the principal executive officer of the corporation and exercise general supervision and control over all the business affairs of the corporation. The new bylaws made the president the principal operation officer of the corporation who was to exercise general operational control of the day-to-day business and affairs of the corporation. They further provided:

> "In the absence of the chairman of the board of directors, or in the event of the death of said chairman, or inability and refusal to act, the president shall perform the duties of said chairman, and when so acting shall have all of the powers of and be subject to all of the restrictions upon said chairman."

At the same meeting, the board had voted to leave the office of the chairman of the board vacant until the next annual meeting of the board. Thus, under the new bylaws and as a result of the action of the board at the 1974 meeting, Thor Myhre had, on October 23, 1974, full executive authority to run the company as both chairman and president.

The new bylaws also provided for "one or more" vice presidents and did not specify any particular duties for them other than standing in for the president in his absence and "such other duties as from time to time may be assigned" by the chairman of the board, by the president or by the board of directors. The board, at the 1974 meeting, elected one vice president Eric Myhre, without any further title specification or assignment of duty. The minutes of that meeting include the following entry:

> "Action on the employment contract and compensation plan of Eric Myhre was delayed until a future meeting."

There had been an employment compensation plan, approved by the

- 11 -

which seems to have been the case with the Myhre corporation. See 2 Fletcher Cyclopedia Corporations, Section 394 at pp. 236, 237 and discussion and cases 19 Am Jur 2d Corporations, §§ 1121 and 1122.

For the above reasons, the award of damages to the plaintiff should be set aside, as should the injunction against removal of Eric from employment.

Turning now to the cross-appeal of Eric, the minutes of the July 3, 1972, annual meeting of the corporation's board of directors includes this entry:

> "A compensation plan was discussed at great length for the present President, Thor Myhre. It was moved by Harry Batty and seconded by Fred Marble that the directors approve the legal intent of this plan.
>
> "The plan is to be drafted in legal form and submitted to the Board of Directors for study. The basic plan to be:  From May 1, 1972 to April 30, 1975 Thor Myhre will receive $36,000.00 annually.  From May 1, 1975 to April 30, 1980, as Chairman of the Board he will receive $30,000.00 annually, as compensation from May 1, 1980 until his death, Thor Myhre will receive $20,000.00 annually and in case of his death Gertrude Myhre, his widow, will receive $20,000.00 annually until her re-marriage or death."

(This Court has added the comma between the words "$30,000.00 annually" and "as compensation" in order to make the second paragraph comprehensible, both parties agreeing that its omission was a clerical error.)

The district court's judgment directed:

> "That the plan of retirement approved by the Board of Directors of Myhre Advertising in its Annual Meeting of 1972, be adhered to by all parties to this action while acting as stockholders, directors and officers of said corporation."

At the time of the 1972 board meeting, the corporation's bylaws called for annual meetings of stockholders to elect directors. Directors held office until the next annual meeting. Officers were to be elected annually by the board at a meeting held

- 13 -

immediately after the stockholder's meeting.  Officers held office until their successors were elected.  Officers could be removed by the board at any time.

At the next annual meeting, on July 2, 1973, the so-called employment contract was discussed again and it was resolved to analyze the plan as proposed (apparently the draft called for in the 1972 resolution) and a report be made on it at the next meeting.  At the next meeting on August 27, 1973, a plan for Thor Myhre's employment contract was tabled after Thor objected it did not conform to the principles for the plan approved in 1972.  At the next meeting, on January 30, 1974, a member of the board presented a resolution for study which resolution stated the corporation had an employment agreement with Thor Myhre under consideration.  At its annual meeting in July, 1974, action was delayed by the board on the employment contract "until a future meeting."

The basic plan, approved by the board in 1972, was beyond the powers of the board.  It made him chairman of the board for five years and set his annual compensation for his service as such.  Even though the bylaws at that time did not provide for a chairman of the board, the board could have created that position because they were authorized to elect or appoint "Such other officers and assistant officers as may be deemed necessary * * *."  And we see no obstacle in the bylaws as they then existed to the board setting a compensation plan for a period longer than a year.  But clearly the bylaws did not permit them to elect an officer to serve between 1975 and 1980 by a resolution of the board in 1972.  Thus, even if the plan had been adopted, it could not be carried out by the board over the objection of any stockholder.

Nor can the plan be enforced on a contractual basis.  The minutes of subsequent meetings all too vividly reveal the board

- 14 -

never agreed on the details of the plan, much less did they ratify or approve of any particular plan or the details thereof. Equity can enforce contracts but not ideas for contracts. Equity can enforce provisions of contracts but it cannot supply them. Even if the 1972 resolution could be called an agreement to agree, equity cannot be called upon to draft the agreement and to execute it for the parties. While there appear to be numerous and most compelling equitable reasons for the awarding of a job security and retirement plan for Thor Myhre, apparently the chief architect and builder of the company, there are very distinct limits on the equitable powers of the courts, and the judgment of the district court exceeds them. Its order with regard to the retirement plan must be reversed. 2 Fletcher Cyclopedia Corporations, § 392 at p. 227 (Perm. Ed. 1969); Electrical Products Consolidated v. El Campo, Inc., 105 Mont. 386, 73 P.2d 199; 1 Corbin Contracts, § 29, pp. 84, 85; 1 Williston on Contracts, 3rd Ed, Section 45; Esselystyn v. Meyer & Chapman State Bk., 63 Mont. 461, 208 P. 910; Phillips & Easton Sup. Co., Inc. v. Eleanor Internat'l, Inc., 212 Kan. 730, 512 P.2d 379, 383; 27 Am Jur 2d, Equity, § 70, p. 593; Autry v. Republic Productions, 30 Cal.2d 144, 180 P.2d 888, 893; Thisted v. Tower Management Corp., 147 Mont. 1, 409 P.2d 813.

The district court judgment includes an order restraining defendants from (a) transferring or encumbering corporation stock, (b) spending corporate funds for noncorporate purposes, (c) setting new salaries, (d) altering, amending or changing the corporate records, and (e) disposing of corporate assets except in the regular course of company business. This is very strong equitable medicine to apply to a going concern, even though conditions in the firm are acutely aggravated and unstable, as seems to be the case here. In any event, the time has come to release these constraints, and the district court should do so without

- 15 -

delay.

Appellants object on technical grounds to the assessment of costs against them. We affirm the judgment of the district court in this regard.

The cause is remanded to the district court for further proceedings in accordance with this opinion.

_____
Hon. Gordon Bennett, District Judge,
sitting in place of Mr. Justice John
C. Harrison.

We concur:

_____
Chief Justice

_____

_____

_____
Justices

IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 13291

ERIC MYHRE,

        Plaintiff and Respondent,

vs.

THOR MYHRE and GERTRUDE MYHRE,

        Defendants and Appellants.



ORDER

In this cause a petition for rehearing was filed by appellants; objections thereto filed by respondents.

While the Court does not ordinarily have an argument by counsel on the merits of petitions for rehearing, in this instance we ordered such an argument. It has been held, counsel presented their positions and the matter was taken under advisement.

The Court having now considered the arguments of counsel and the documents filed by the parties denies the petition for rehearing.

Let remittitur issue forthwith.

DATED this 10th day of December, 1976.

Hon. Gordon Bennett, District Judge, sitting for Mr. Justice John Conway Harrison, who is disqualified.