DA 24-0086

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 307

FILED

12/17/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0086

IN RE THE ESTATE OF ROBERT BRENDEN,
ROD BRENDEN, Personal Representative,

BARBARA JENSEN,

      Third Party Plaintiff and Appellee,

   v.

JILL BRENDEN, an individual,

      Third Party Defendant and Appellant,

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DP-17-69C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

       Margot B. Ogburn, Ogburn Law Firm, PLLC, Bozeman, Montana

     For Appellee:

       Todd R. Hillier, Schraudner & Hillier, PLLC, Bozeman, Montana

                  Submitted on Briefs:  October 9, 2024

                          Decided:  December 17, 2024

Filed:

                       _____
                               Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Jill Brenden (Jill) appeals the Order entered in the Eighteenth Judicial District Court, Gallatin County, on January 11, 2024, denying her claims against the estate of her late husband, Robert Brenden (Robert), seeking reimbursement for expenses and objecting to the distribution and valuation of certain property included in the estate. Appellee and third-party plaintiff, Barbara Jensen (Barbara),[1] additionally seeks attorney fees. We affirm in part and reverse and remand in part.

¶2     We restate the issues for review:

   1. *Whether the District Court abused its discretion in admitting bank subscriber notes as a business record exception to hearsay.*

   2. *Whether the District Court erred in concluding Jill had converted the funds in Robert's account.*

   3. *Whether Barbara is entitled to attorney fees.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     Jill and Robert began a relationship in 2000, began cohabitating in 2002, and married in 2010. In 2006, they purchased a home together (New Holland Home). In 2014, Robert quitclaimed a parcel within a larger property he had inherited to himself and Jill. They began building a home on the site (Red Rock Home).

¶4     During the construction of the Red Rock Home, Robert was diagnosed with cancer. With treatments, Robert's cancer went into remission. However, the cancer returned in

---

[1] Barbara Jensen was Robert's sister and died shortly before the conclusion of the trial. Her estate succeeded her as the real party in interest. For the purpose of convenience, we will continue to refer to Barbara's Estate as Barbara.

December 2016. When Robert's cancer returned, the couple were living in the Red Rock Home and under contract to sell their New Holland Home. Closing occurred on March 9, 2017. Jill picked up the check for the purchase price of $206,099.23, payable to "Robert Brenden and Jill Brenden," from the title company on March 13, 2017. Jill apparently believed that, because Robert had not signed the check, she could only deposit the check into his account. Robert's bank was on Jill's route home and she deposited the check into Robert's account rather than her own out of convenience. Unbeknownst to Jill, Robert had designated Barbara the Payable on Death (POD) beneficiary for that account. Barbara had been the POD beneficiary since Robert opened the account in 2006.

¶5     Robert was experiencing debilitating side effects from his cancer and treatments and was only able to leave the home to go to the hospital. He was experiencing fatigue and managing his pain with Tylenol and Dilaudid. Still, he had an appetite and was cogent when he was admitted to the hospital on March 22, 2017. His condition deteriorated the next day and by March 24, 2017, Robert was difficult to understand. Early on March 25, 2017, Robert was experiencing excruciating pain and was unable to speak. Medical personnel administered additional pain mitigation measures. By that evening, Robert was intubated to assist with his breathing and the family elected to pursue palliative care. Robert died at approximately 9:35 p.m. on March 25, 2017.

¶6     Jill later testified that just before Robert's rapid decline over the course of March 25, 2017, the two of them had breakfast in his hospital room. During the meal, Jill claimed Robert instructed her to transfer the funds from his bank account, including the proceeds

3

from the sale of the New Holland Home, into her own account. Jill had Robert's account information and had often accessed the account with Robert's implicit authorization but had never transferred funds to herself as a payee. Jill accessed the account via the online banking client with her laptop from the hospital and attempted to transfer $254,000 to herself. This attempt was unsuccessful, but Jill was eventually able to make five transactions: four transfers each in the amount of $50,000 and one in the amount of $54,000. She claimed to have accomplished the transfers in about 15 to 20 minutes and did not recall receiving any activation codes or answering security questions.

¶7 At trial, testimony from Robert's sons, Scott and Rodney Brenden, as well as medical records contradicted Jill's testimony regarding Robert's condition on the morning of March 25, 2017. They testified that Robert was comatose or otherwise unable to communicate. Contemporaneous medical records indicate that Robert was experiencing extreme pain. He was drowsy and would wake to verbal stimulation. Robert could orient himself only to who he was and where he was, not to the time and his situation.

¶8 Testimony from Chanelle Sanders (Sanders), an electronic banking department manager from Big Sky Western Bank (BSWB) where the account was located, likewise contradicted Jill's testimony regarding the timing of the payments from Robert's account as shown through electronic account records. These BSWB records indicated that between 1:29 a.m. and 1:31 a.m. on March 26, 2017, five security questions were successfully answered. These "subscriber notes" for Robert's account recorded the five payments to

Jill on March 27, 2017, and Jill's bank account recorded five deposits in the same amounts from Robert's account on March 28, 2017.

¶9     Jill continued to access the account in the months after Robert died, both depositing checks made payable to Robert and transferring funds to herself, without notifying the estate. Jill also accessed Robert's safe. Rodney, the personal representative of the estate, could not locate a number of items he believed had been stored in the safe as recently as the month before Robert's death, including antique silver dollars, gold and silver bars, and documents relevant to the distribution of the estate. Jill later produced the silver dollars, but it was not until an informal exchange of documents with Jill that Rodney inadvertently discovered Robert's BSWB account, and that Robert had designated his sister, Barbara, as the POD beneficiary.

¶10     Barbara intervened in the probate action, filing a third-party complaint against Jill for wrongful conversion of the POD account proceeds and deceit. Jill counterclaimed, alleging unjust enrichment and seeking a constructive trust over the proceeds from the sale of the New Holland Home. The District Court granted judgment in favor of Barbara on January 11, 2024, awarding Barbara the $254,000 transferred out of the bank account in damages. On appeal, Jill argues that the District Court erred first by admitting the BSWB account records as business records and second by finding she had converted the BSWB account. She requests this Court impose a constructive trust on the account, arguing that Barabara was unjustly enriched by receiving the proceeds from the sale of the home Jill owned with Robert.

**STANDARDS OF REVIEW**

¶11 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Hardman*, 2012 MT 70, ¶ 8, 364 Mont. 361, 276 P.3d 839 (citation omitted). A court abuses its discretion if it acts without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Hardman*, ¶ 8 (quotation omitted).

¶12 We review a district court's findings of fact in an equitable action to determine whether the findings are clearly erroneous. *Anderson v. Woodward*, 2009 MT 144, ¶ 12, 350 Mont. 343, 207 P.3d 329 (citations omitted). A finding is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Anderson*, ¶ 12 (citation omitted). We view the evidence in the light most favorable to the prevailing party. *Anderson*, ¶ 12 (citation omitted). We review a district court's conclusions of law to determine whether those conclusions are correct. *Anderson*, ¶ 14 (citation omitted).

**DISCUSSION**

¶13 *1. Whether the District Court abused its discretion in admitting bank subscriber notes as a business record exception to hearsay.*

¶14 Jill argues that the subscriber notes were inadmissible hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." M. R. Evid. 801(c). Hearsay is inadmissible except as provided by statute, the Rules of Evidence, or other applicable rules

in the courts of this state. M. R. Evid. 802. Statements otherwise excluded by the hearsay rule may nonetheless be admissible if one of several exceptions to the rule applies, including business records "kept in the course of a regularly conducted business activity" as part of an ordinary record-keeping process. M. R. Evid. 803(6). In support of her argument, Jill relies on the proposition that the business records exception "requires the entity *creating* the business record—not the entity *receiving* it—to establish that the record was prepared in accordance with its regular and trustworthy business practices." *State v. Baze*, 2011 MT 52, ¶ 19, 359 Mont. 411, 251 P.3d 122 (emphasis in original).

¶15 Here, testimony from Sanders confirmed that BSWB relied on the timestamps ascribed to various account activities by the bank's third-party online transaction manager "to inform a customer about when . . . actions were taken electronically on their account" and then logs those times in BSWB's records as "subscriber notes." "Business records are presumed reliable because: 1) employees generating these records are motivated to accurately prepare these records because their employer's business depends on the records to conduct its business affairs; and 2) the routine and habit of creating these records also lends reliability." *Baze*, ¶ 12 (citation and emphasis omitted). While BSWB relies on a third-party online services vendor to provide the time stamps, the actual account statements admitted in this case are routinely and habitually produced by BSWB for its customers in the regular course of business, thus enjoying all the hallmarks of reliability. When BSWB incorporates the time stamps into its own statements, BSWB effectively adopts the records produced by the third-party online services vendor as its own representation to its

customers about the status of their accounts. For these reasons, the account records *are* created by BSWB. Unlike *Baze*, where a more complex chain of custody saw an employee of one hospital authenticating the records faxed from another hospital, *Baze*, ¶ 19, the case here involves BSWB's own records, produced and authenticated by BSWB employees with the assistance of their contracted online platform partner. Accordingly, these records are not inadmissible hearsay.

¶16    *2. Whether the District Court erred in concluding Jill had converted the funds in Robert's account.*

¶17    A conversion claim requires the plaintiff prove four elements: (1) property ownership by the plaintiff; (2) plaintiff's right of possession of the property; (3) defendant's unauthorized control over the property; and (4) damages. *Feller v. First Interstate Bancsystem, Inc.*, 2013 MT 90, ¶ 26, 369 Mont. 444, 299 P.3d 338 (citations omitted). "Conversion is a distinct act of dominion wrongfully exerted over one's property in denial of, or inconsistent with, the owner's right." *Feller*, ¶ 26 (quotation omitted).

¶18    Here, Barbara, as the POD beneficiary, became owner of the assets in the account upon Robert's death at 9:35 p.m. on March 25, 2017. Barbara's right to possess the account's funds developed from the express contract between Robert and BSWB naming her as POD beneficiary and by operation of law. Section 72-6-212(2)(b), MCA (Following the death of the sole party, sums of deposit in a POD account "belong to the surviving beneficiary."); § 72-6-214, MCA ("A transfer resulting from the application of § 72-6-212 is effective by reason of the terms of the account involved and this part and is not testamentary or subject to [the Universal Probate Code in Title 71, chapters 1 through 5,

8

MCA].").  Based on the terms of the account and pursuant to §§ 72-6-212(2)(b) and 72-6-214, MCA, Barbara assumed ownership over Robert's account upon his death.

¶19    The District Court heard testimony from Sanders that BSWB's system recorded five activities on Robert's account between 1:29 a.m. and 1:31 a.m. in the morning on March 26, 2017—after Robert had died.  These five "subscriber notes" logged the satisfactory answering of five security questions.  Multiple actions undertaken by an online user could generate these security checks, including initiating a transfer of funds through online bill pay.  Other than the creation of a new payee at 2:47 p.m. and two events related to accepting updated terms and conditions at 2:40 p.m. on March 25, 2017, there were no other subscriber notes to indicate a transfer of funds from Robert's account that day.  BSWB representatives had already testified that any activation code would have been sent either by email or text message to Robert to confirm a new payee, but Jill was unable to provide evidence of such an activation code for the time she claimed to have logged into the account.  She did claim to have attempted to transfer the entire amount of $254,000 from Robert's account but this action was denied.  She was later able to make the five separate, smaller transfers totaling $254,000.  She could not recall specifically when she made the transfers, but she was adamant that she did so before he died.  Further, she claimed that Robert requested she make the transfers.

¶20    The District Court was not convinced by Jill's testimony that she made the five transfers prior to Robert's death.  Even if the timestamps on the "subscriber notes" reflected an inaccurate or delayed time, the sons' testimony and the relevant medical records showed

Robert was unable to authorize the transfers due to his diminished capacity on March 25, 2017. The records produced by BSWB employees, coupled with evidence of Robert's deteriorating condition over the course of his final day, support the District Court's conclusion that Robert was unable to make such a request and Jill did not make the transfers until after he died. The District Court is in the best position to observe and judge the strength and credibility of witnesses; therefore, we will not second guess the district court's determination regarding the strength and weight of conflicting testimony. *Brimstone Min., Inc. v. Glaus*, 2003 MT 236, ¶ 20, 317 Mont. 236, 77 P.3d 175 (citation omitted). The District Court did not clearly err in determining that Jill unlawfully converted funds in Robert's account by transferring the funds after he had died, and that Barbara became the rightful owner of the account.

¶21 However, Jill argues that she could not have converted her share of the proceeds of the sale of the New Holland Home ($103,049.62) because they were held in a resulting trust for her in Robert's account. As the District Court noted, "[w]here title is held by one party but the consideration paid by another, a resulting trust arises in favor of the latter." *In re Estate of Lettengarver*, 249 Mont. 92, 96, 813 P.3d 468, 471 (1991); § 72-38-122(1), MCA ("When a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person who paid the purchase price."). "A resulting trust does not arise, however, where the party holding title is the spouse of the party providing the consideration." *In re Lettengarver*, 249 Mont. at 96, 813 P.3d at 471; § 72-38-122(2)(b), MCA. "In such cases, a gift is presumed, a presumption that may be

overcome only with clear and convincing evidence." *In re Lettengarver*, 249 Mont. at 96, 813 P.3d at 471 (citing *Lewis v. Bowman*, 113 Mont. 68, 77-78, 121 P.2d 162, 167 (1942) (overruled on other grounds *Cook v. Cook*, 159 Mont. 98, 102-03, 495 P.2d 591, 593 (1972)); *see also Myhre v. Myhre*, 170 Mont. 410, 415-17, 554 P.2d 276, 279-80 (1976).

¶22     In *In re Lettengarver*, we held that a husband had not overcome the gift presumption where a property purchased with the proceeds of the sale of a jointly-held ranch was titled solely in his wife's name; he claimed that his wife had granted him a life estate in the property, but could not provide any evidence to that effect; and he paid for a share of the utilities but not for the property taxes or insurance. *In re Lettengarver*, 249 Mont. at 96, 813 P.3d at 471. In *Myhre*, we found that a wife had overcome the gift presumption where she signed shares of stock over to her husband but later, acting as the record keeper of the corporation, canceled the shares involved and reissued them to herself with no protest from her husband, who subsequently voted his original number of shares. *Myhre*, 170 Mont. at 416-17, 554 P.2d at 279-80. We also relied on the maxim that "[t]he expert on [the matter of donative intent] should be the purported donor," finding the wife's testimony regarding her intent "pivotal." *Myhre*, 170 Mont. at 416, 554 P.2d at 279.

¶23     The instant case more closely resembles *Myhre* than *In re Lettengarver*. True, Jill deposited the full amount of the proceeds from the sale of the New Holland Home in Robert's account, but she believed she had to because the check did not have Robert's signature. Like the corporate record-keeping performed by the wife in *Myhre*, Jill testified that she regularly managed Robert's accounts, which reduces the significance of her

11

decision to deposit the money in his account. Also like the wife in *Myhre*'s subsequent reissuing of the stocks she had signed over, Jill's subsequent withdrawal of the proceeds from Robert's account belies an intent to gift them to him. Finally, Jill, the expert on her own intent, testified that she did not intend to gift her share of the proceeds to Robert. Absent an agreement to the contrary, the proceeds of the sale of joint tenancy property pursuant to a contract are owned in joint tenancy. *In re Rickner's Estate*, 164 Mont. 51, 56, 518 P.2d 1162 (1974). The District Court erred when it held that Jill had not presented sufficient evidence to overcome the gift presumption. Jill's share of the proceeds from the sale of the New Holland Home were held in a resulting trust in Robert's account, so she did not convert them when she withdrew them from his account. Accordingly, Jill did not convert her share of the proceeds from the sale of the New Holland Home and is thus entitled to $103,049.62.

¶24     *3. Whether Barbara is entitled to attorney fees.*

¶25     "In Montana, attorney fees are allowed in civil cases when they are provided for by statute or contractual provision." *R.C. Hobbs Enter., LLC v. J.G.L. Distrib., Inc.*, 2004 MT 277, ¶ 49, 325 Mont. 396, 104 P.3d 503 (citations omitted). Barbara argues that a POD account is a *Totten* trust. *Matter of Totten*, 179 N.Y. 112, 71 N.E. 748 (New York 1904); *Totten trust*, *Black's Law Dictionary* (12th ed. 2024) ("A Totten trust is an early form of 'pay on death' account since it creates no interest in the beneficiary unless the account remained at the depositor's death."). As such, Barbara maintains she is entitled to attorney fees. Section 72-38-1004, MCA ("In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses,

12

including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."). Here, Barbara did not raise the issue of whether § 72-38-1004, MCA, applies to Robert's account in the District Court and instead raises it before this Court for the first time. We will not address this novel issue now on appeal. *Nason v. Leistiko*, 1998 MT 217, ¶ 11, 290 Mont. 460, 963 P.2d 1279.

## CONCLUSION

¶26 The District Court did not abuse its discretion admitting the BSWB subscriber notes as a business record exception to the hearsay rule. The District Court did not err in concluding that Jill converted Robert's account which designated Barbara as the POD beneficiary, but the District Court erred in denying Jill's request for a constructive trust over half the deposited proceeds of the New Holland Home. Barbara's request for attorney fees is denied. Affirmed in part, reversed and remanded in part.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE