747 So.2d 1203 (1999)
Vera FOSTER and Sue Crouch, Plaintiffs-Appellants,
v.
Faye Brown BLACKWELL, as Secretary/Treasurer of B&C Broadcasting, Inc., Defendants-Appellees.
Nos. 98-1654, 98-1655.
Court of Appeal of Louisiana, Third Circuit.
November 24, 1999.
Writ Denied February 18, 2000.
*1204 William Joseph Mize, Robichaux, Mize & Wadsack, L.L.C., Lake Charles, LA, James Buckner Doyle, Merrick J. Norman, Jr., Lake Charles, LA, for Vera Foster, et al.
Ernest Lloyd Johnson, Attorney at Law, Baton Rouge, LA, for Faye Brown Blackwell, etc., et al.
Frank Theo Scott, Jr., Baton Rouge, LA, for B&C Broadcasting, Inc.
BEFORE: COOKS, DECUIR, and AMY, Judges.
COOKS, Judge.
Vera Foster and her daughter, Linda Sue Crouch, shareholders of B&C Broadcasting Corporation, are appealing the trial court's decision dismissing their petition challenging and seeking cancellation of 385 shares of stock issued to another shareholder, Faye Brown Blackwell. They also filed a separate quo warranto action attacking the authority of Faye Blackwell, Secretary/Treasurer, and Larry Bellow, President, to serve in their respective capacities as officers of B&C Broadcasting, Inc. The trial judge, on his own motion, granted an Exception of No Cause and No Right of Action finding Vera Foster and Crouch were not owners of any valid stocks in B&C Broadcasting, Inc. As such, he held, they lacked standing to institute an action in quo warranto; and they were not entitled to any preemptive rights-the corporation was not required to first offer them the opportunity to purchase additional proportionate shares of its stocks from future offerings. Alternatively, he reasoned, even if they owned valid stocks in B&C Broadcasting Inc., their petitions nevertheless lacked merit because the "Corporation legally ratified, acknowledged and acquiesced in the issuance of the ... shares to Faye Blackwell [for a] par value of [$500.00]" at a June 8, 1996 Board meeting. If all else failed, he declared, Faye Blackwell's only remedy in law is "unjust enrichment;" and simply to "[allow] reimbursement only for the money she advanced to the corporation is "unequitable and a travesty of justice." We find the stock issuance to Faye Blackwell was valid for different reasons and affirm the trial court's judgment.

RELEVANT FACTS
Normally, groups of investors wishing to secure licenses from the Federal Communication Commission (FCC) are required to employ engineers to determine whether radio frequencies exist in particular areas. They then are required to supply the FCC with the information gathered and convince it they are the best applicant to award a license. However, during the 1980's, the FCC set up what was then known as the "80/90 docket." We surmise from the testimony the FCC, on its own initiative, identified "some 200 frequencies nationwide," designated and placed them on the "80/90 docket" for allocation. Desiring to increase minority participation in the radio industry, the FCC also set up a comparative grading scheme that awarded points (weights) to groups vying for the designated frequencies based on various factors. Usually groups whose membership included local individuals (especially those involved in community services), minorities, and women ranked high and were in the best position to successfully compete for the "80/90" allocations.
Kent Foster, a lawyer and the son of Vera Foster, hired Joe Mims to assist him in organizing groups consisting of minorities, local folks, and women to apply for the special FCC licenses. In furtherance of his assignment, Mims approached potential venturers possessing the noted characteristics and aided Kent Foster in *1205 forming 17 groups, including B&C Broadcasting Limited, that ultimately submitted applications for licensing to the FCC.
The FCC licensing process is an expensive undertaking which require groups to complete two phases-the application and construction. In the first phase, groups are required to hire various experts in the communication field, including lawyers familiar with the FCC administrative rules, for filing and hearing applications. Once the FCC decides to allocate a license to a particular group, it issues a "building permit" which authorizes the group to begin construction of a radio station. The second phase of the process usually demands the greatest capital. In addition to financing a home base from which to operate, the group is expected to secure a "site, tower, and transmitter" to access the designated frequency. The permanent FCC license is not issued until completion of the construction phase. The FCC retains authority to revoke the "building permit" if the group does not meet certain construction datelines.
In 1987 Mims approached Faye Blackwell, a former city council member, and Carol Collins to interest them in "becoming station owners" of a frequency on the FCC "80/90 docket" designated for the Lake Charles area. Collins and Blackwell were "local residents with deep community ties" and "minority women." As Mims put it, "they reviewed the information that [he] presented to them about the opportunity for minority females ... to become station owners, based upon this new federal policy... to increase minority ownership of radio stations in the United States." Eventually, Collins and Blackwell became general partners in a venture known as B&C Limited PartnershipVera Foster (the alter ego of her son) and Ralph Frank joined as limited partners. The partnership agreement signed by all the named partners recited in relevant parts:
* * *
2. Pursuant to a discussion which took place on this date in Lake Charles, Louisiana, all parties acknowledge that Mrs. Foster and Mr. Frank shall, under all circumstances, be solely passive investors. Mrs. Foster and Mr. Frank shall not be involved, directly or indirectly, in the management, operations, or activities of the radio station which B&C Broadcasting proposes to build and own, and their involvement in B&C Broadcasting shall be strictly limited to their financial investment in B&C Broadcasting, loans to B&C Broadcasting, and the financing rights attendant thereto.

* * *
5. The limited Partners represent that they will make available to B&C Broadcasting the sum of Three Hundred Fifty Thousand Dollars ($350,000.00) to construct and operate B&C Broadcasting's proposed station for three months without reliance on revenues. The General Partners are to obtain written confirmation of this "reasonable assurance" on or before the date on which the application is filed.
6. B&C Broadcasting shall rely upon capital contributions of the partners to pay for the preparation, filing and prosecution of the B&C Broadcasting application. To the extent additional funds may be required for this purpose, including any costs associated with a comparative hearing before the FCC, the Limited Partners agree to loan to B&C Broadcasting additional sums up to a maximum of One Hundred Fifty Thousand Dollars ($150,000.00) on commercially reasonable terms. These funds will be advanced when and as the General Partners require. ..."[1]
*1206 According to Mims, Kent Foster was a silent partner in the venture and actually advanced funds to the general partners when needed through a process known as "cash calls." As Mims explained: "a cash call is the communication attorneys language that was used throughout the whole process ... when cash was needed to pay engineering fees, legal fees, start-up expenses, those were considered as cash calls made by the applicants, which were the general partners, or the controlling partners, or the minority partners, to the investor. In this case it was Mr. [Kent] Foster." Although Kent Foster "fronted" the cash to finance the venture, the partnership interest was listed in Vera Foster's name because, as Mims testified, the FCC was familiar with "[Kent] Foster's operation-so it made it difficult for him to get any more allocations" and "he did not want to rock the boat."
In the past, Mims stated, Kent Foster was either a named investor or silent partner in 16 joint ventures that were allocated radio frequencies by the FCC; but 14 of them failed because he did not advance sufficient capital to the groups and the "minorities" were unable to complete the FCC licensing process. In these instances, the stations never went on the air and the partners "settled" with other ranking competitors during the comparative hearing process or the FCC simply withdrew their "building permits." Foster, according to Mims, "was in it to get the allocation and sell it."
B&C Broadcasting as a limited partnership competed against four groups "over the next few years" for the Lake Charles allocation. One of the groups, Sabine Broadcast Partnership, was headed by John Henning. Henning possessed sufficient capital; but his group's only minority member "left very early" in the process. In an effort to increase his ranking, Henning approached Carol Collins-then one of B&C Broadcasting's minority members. The two partnerships eventually agreed to merge and "buy out" Boss Action, the only viable group remaining-the other groups simply "dropped out" or were disqualified. The two groups' members later met on April 19, 1991, for the express purpose of continuing the venture as a corporation. The minutes of that meeting recite in pertinent part:
Two hundred shares of common stock were issued at $500 per share, as according to the merger agreement between B&C Limited Partnership and Sabine Broadcast ... The amount of stock for each was as follows:
 Ralph Frank-18 shares,
 Carol Collins-25 shares
 Faye Blackwell-25 shares,
 Vera Foster-64 shares.
The purpose of the corporation is to build, operate and maintain a profitable radio station in the Lake Charles area. The initial capital needed is $75,500($75,000 to buy Boss Action out of the FCC proceeding, and $500 to place into a bank account for operating capital). Earlier, all of the incorporating members put up the $75,000 to buy out Boss. The monies were placed in a trust account with FCC Lawyer Henry David Hill, to fund initial needs, 151 shares were issued at $500 per share.... Those who purchased shares are as follows:
 Faye Blackwell-22 shares,
 Ralph Frank-16 shares
 Vera Foster-55 shares
 Sabine Broadcast-58 shares.

* * *
The incorporators unanimously elected as directors of the new corporation Carol Collins, Faye Blackwell, Ralph Frank and John Henning. The members met several times over the next few months. The minutes reflect at the May 31, 1991 and August 24, 1991 meetings they discussed, among other things, "different type[s] of financing," and agreed to operate "with resolution[s] instead of bylaws." A motion to place Larry Bellow, Cynthia Victorian *1207 and Ed Metoyer, a/k/a, Mike Mitchell on the board of directors also unanimously carried. The actual "Articles of Incorporation" for B&C Broadcasting, Inc. was not recorded with the Secretary of State until September 17, 1991.
All went well for a while. John Henning, as secretary treasurer, initially spearhead the corporation's efforts to secure the FCC radio allocation. According to Henning, he looked for land as a site for a tower, handled zoning matters, and basically "did everything" until he resigned in August, 1993. From time to time, the corporation paid various bills. In Henning's words, "If you don't pay like the engineer, you don't pay the lawyer, they will not file a particular filing with the FCC, and if you miss that particular filing, then you would-basically, you'd be out of the hunt." When Henning needed money to pay these expenses, he "always used cash calls." Henning would notify the shareholders that certain expenses were payable and it was necessary to make stock offerings to satisfy the corporation's indebtedness. The shares had a par value of $500.00, the price Henning testified "we picked ... because it was easier to work with when we first incorporated."
The Corporation's records reflect on January 6, 1992, Henning made a cash call to all the stockholders for 43 shares at a par value of $500.00 Each stockholder had opportunity to purchase the shares in proportion to their interest in the Corporation within 30 days after receipt of notice. Vera Foster purchased 14 shares and John Henning purchased 15 shares of B&C Broadcasting, Inc. stocks for the noticed price. The remaining stocks offered were return to the general pool for reissuance at a later date "when ... money [was] needed." On December 18, 1992, John Henning wrote a letter to Vera Foster notifying her that:
B&C Broadcasting is having its annual stockholders meeting on December 30, 1992, at 1109 Pithon Street, Lake Charles, La. The meeting will be held at 5:30 p.m. I will be fielding questions that you may have and the future of B&C. Afterwards we will have a Board of Directors meeting if needed.
In addition to this letter being a notice of a stockholders meeting, this is a notice of capital call for past and future expenses that we will incur. These expenses will be discussed at the Board of Directors meeting.
B&C needs to issue 32 shares of common stock at $500 par value. Since you are a shareholder, you have an option to purchase 11 shares because of your 36% ownership in B&C Broadcasting, Inc. You have thirty days from receipt of this letter to exercise your option. If you choose not to purchase the new shares of stock that is available to you, the stock will be first offered to the existing stockholders, and then to the general public. All stocks offers are subject to Federal Communications Commission notice....
The other stockholders received the same notice addressed in their names; the only language change related to the percentage of shares they could purchase. From this "capital call," the following purchases were made on January 15, 1993: Vera Foster 11 shares, Henning 11 shares, Blackwell 4 shares, and Frank 2 shares. On February 15, 1993, Henning purchased the remaining 4 shares.
During the interim between the stock offerings, the Board of Directors met twice. Once on May 6, 1992 and elected the same members to serve as directors in 1992; and on December 30, 1992 it again unanimously elected the same members to serve through 1993.[2]
In August, 1993 Henning resigned as an officer of B&C Broadcasting, Inc., sold his stocks in the Corporation to Linda Sue Crouch and "turned all [his] *1208 files over" to Faye Blackwell, who was elected Secretary/Treasurer. According to Henning, Faye Blackwell "pretty much-I guess you could say she stepped in my shoes and started doing everything." Blackwell stayed in contact with Henning and asked for his assistance in reviewing "a stack of files about six feet high." The construction phase of the process had not been completed when Henning resigned and the dateline was fast approaching.
On August 4, 1993, Faye Blackwell addressed a letter to Linda Sue Crouch which stated:
B&C Broadcasting is incurring expenses and expects future expenses in the form of general station manager, secretary, office space, office supplies and equipment, F.C.C. filing, F.C.C. engineer, consulting engineer, part-time bookkeeper, land surveyor for tower site and underground electrical design.
This is a notice of capital call for these expenses that we will incur.
B&C needs to issue sixty-five (65) shares of common stock at Five Hundred Dollars ($500.00) par value. Since you are a shareholder, you have an option to purchase 24 shares because of your 37% ownership in B&C Broadcasting, Inc. You have thirty (30) days from receipt of this letter to exercise your option. If you choose not to purchase the new shares of stock that are available to you, the stock will be first offered to the existing shareholders, and then to the general public. All stock offers are subject to Federal Communication Commission notice....
All the remaining stockholders received notice of the offering and were given opportunity to purchase proportionate shares within the thirty day window.
On August 9, 1993 the Board of Directors met. During this meeting, Blackwell expressed "concern over the seriousness of the Corporation's failure to keep at least $5,000 in the checking account at all times." She noted "[t]he account to date was less than $1,000 with several outstanding checks being out, and that [the] recent cash call made August 4th, was not due until September 4th." Blackwell further stated "she had discussed this with newly retained Attorney, Carl Hanchey, and that she felt a loan of $32,000 (until the stockholders purchased their new shares) would be in the best interest of the Corporation." The Board agreed to "borrow the money for ninety (90) days from Mrs. Blackwell, and repay the loan plus the interest ... at 2 pts. above the prevailing prime rate."[3] Blackwell suggested the Board use the loan to begin construction on the tower site to "insure the approval of [an] extension if necessary by the FCC." The Board agreed to enter a contract with a builder to erect the tower "at a price of $26,836.50." The Board also approved paying $400.00 a month for temporary office space until a permanent office site was located. Blackwell was "given the authority to act on behalf of the Board to proceed with full speed on the project."
Vera Foster and Linda Sue Crouch did not opt to purchase any of the 65 shares offered in August, 1993. And, they did not voice any objection to the offering. The Board met again on August 27, 1993. Blackwell noted the majority stockholders had not responded yet to the "cash call." During the meeting, the Board placed a call to Kent Foster who "assured the Corporation that the cash call funds would be forthcoming." The minutes also reflect: "It was moved by Mrs. Blackwell and seconded by Mr. Bellow to contact Sue Crouch about filling the vacancy that may be created by Ralph Frank."
On December 13, 1993, Blackwell addressed a letter to all the shareholders reminding them the $32,000.00 she loaned the corporation had not been paid; and, she offered to accept "in lieu of cash repayment," *1209 64 shares of "the capital stock" in full payment of the debt. Bellow and Metoyer accepted her offer in writing. Foster and Crouch did not respond.
The Board met again on December 19, 1993. The minutes of that meeting stated:
In Attendance: Larry Bellow and Faye Blackwell. The meeting was called to order by Mrs. Blackwell at 5:40 p.m. Mr. Bellow informed the Board of his disappointment over the failure of Ms. Crouch to accept her Board of Directors' appointment since the September [August] meeting.
It was moved by Mr. Bellow and seconded by Mrs. Blackwell that we should proceed with the plans because two (2) Members fulfilled the requirements of the by-laws. Motion passed.
It was moved by Mr. Bellow and seconded by Mrs. Blackwell that the capital calls should be prepared and made early in 1994 to get the station on the air. Motion passed....
Receiving no funds or other reply from the Fosters, Blackwell testified in January or February 1994, she again contacted Kent Foster. During the conversation, Blackwell related, he instructed her to send his accountant, Michael Russell, "a requisition list [verifying] the request for money."[4] Blackwell gathered the information and addressed a letter to Russell on March 24, 1994 detailing the anticipated expenses of the Corporation to finish the construction phase of the project. She also addressed a second letter to him on the same date, captioned "Re: Call for Cash," stating "[p]ursuant to the agreement between Mr. Kent Foster and KZWA Broadcasting, Inc., you are hereby advised that I am making a call on behalf of KZWA for the amount of $279,883.29 to cover ongoing expenses and start up costs for our station. Please send a check in this amount made out to KZWA within the next twenty (20) days...." But the Fosters still did not respond.
In the interim between Blackwell's conversation with Kent Foster and the letter she addressed to his accountant, the Board met. The March 7, 1994 minutes state Blackwell expressed "disappointment over the failure of the two (2) stockholders who had not responded to the offer to accept the additional stock in lieu of the $32,000 loan to the Corporation." Bellow also moved, seconded by Blackwell, that "new stock be re-issued to reflect the stock owed, as well as the interest that had been a part of the promissory note."[5]
On April 10, 1994 Blackwell addressed a letter to the shareholders stating:
B&C Broadcasting is having its annual stockholders' meeting on April 22, 1994, at 2321 Elaine Street, Lake Charles, La. The meeting will be held at 4:00 p.m. I will be fielding questions that you may have concerning the future of B&C and the suit that has been filed against us, a copy of which is enclosed.
In addition to this letter being a notice of a stockholders' meeting, this is a notice of capital call for past and future expenses that we will incur. These expenses will be discussed at the Board of Directors' meeting.

*1210 B&C needs to issue three hundred and twenty-five (325) shares of common stock at $500.00 par value. Since you are a shareholder, you have an option to purchase [][6] shares because of your [][7] ownership in B&C Broadcasting, Inc. You have thirty (30) days from receipt of this letter to exercise your option. If you choose not to purchase the new shares of stock that are available to you, the stock will be offered to the existing shareholders, and then to the general public. All stock offers are subject to Federal Communications Commission notice....
Vera Foster and Linda Sue Crouch both confirmed they received the April 10, 1994 meeting and "cash call" notice. Foster testified she "wasn't interested" in purchasing any more stocks from this "cash call" offering and "didn't want to invest further right now" in the Corporation. Though Foster expressed concerns about the direction the "business was going" and the "budget set up," she did not immediately share her thoughts with Blackwell.[8] When asked "[s]o when Blackwell wrote the 325 cash call, you just ignored that," she responded "Yes, Sir." Linda Sue Crouch echoed her mother's reservations about investing more money in the Corporation; and, she too failed to voice objection to the "cash call" offering.
The Board and Shareholders did not meet on April 22, 1994 as noticed because of the "stockholders inability to communicate." However, according to Blackwell, the date of the meeting was changed to the next day and occurred when she telephoned Crouch. The only parties who actually participated in the "telephonic meeting" were Blackwell and Crouch. Blackwell's notes for that day recite she discussed with Crouch the failure of the stockholders to exercise their right to purchase additional shares and she "expressed a need to offer the shares to the public or someone who could afford it." Blackwell also wrote "[w]e discussed the suit ... filed against us ... the urgency for legal fees of $3,500.00 ... the critical state of our finances and the additional money that had to be deposited immediately for the State of Louisiana Corp. Taxes."[9] Asked whether Blackwell discussed the need for a "cash call," Crouch testified at trial: "I'm trying to be very specific. I don't know-I just know a need for money. I don't know if she used the term `cash call.'" While Crouch testified she did not "ratify" the 325 shares offered in the April "cash call," she voiced no objection to it.
Without funds to complete the project, Blackwell decided to borrow the needed capital from Calcasieu Marine National Bank. Over the years, Blackwell apparently had established a good financial relationship with the bank; and, it quickly agreed to loan her $150,000.00. Anthony Bartie, the Bank's loan officer processing Blackwell's request, testified he knew she intended to use the loan proceeds to capitalize B&C Broadcasting, Inc., but the loan was extended to her personally.[10] It was secured by a mortgage on her rental and residential properties. Although the promissory note signed by Blackwell listed an FM Tower and Transmitter on a leased site as additional collateral for the loan, Bartie testified when he inserted these items on the note he "meant that [they were] what she was using the funds to purchase, and basically that was it." On May 13, 1994, the Bank tendered $75,000.00 *1211 to Blackwell; and, as she instructed, it transferred by wire $21,275.00 to the account of Continental Electronics Corp, as payment on the transmitter and $33,831.50 to Falcon Tower Fabricators, Inc.'s account as payment on the tower. On May 16, 1994, she deposited in B&C Broadcasting, Inc.'s account $12,807.75. On the same date Blackwell sent a notice conveying her intent to purchase 280 shares from the April 10th cash call "since there were no stockholders who opted to exercise their rights to purchase additional shares." She also sent a certified letter to Vera Foster and Crouch expressing:
After numerous times of trying to convey the sense of urgency to you, regretfully, I must inform you that time is running out. We are desperately in need of the funds to finance the station in order to get it on the air for July 12, 1994 as stipulated by the F.C.C.
Again, I inform you that we have been advised by our F.C.C. attorney that extensions are not looked on favorably by the F.C.C. anymore. This practice has been curtailed, and we maybe in jeopardy of losing our license. This would be a terrible mistake. I am more concerned than ever about the future of the station, because there seems to be a lack of interest regarding the status of the lawsuit and all other matters that [pertain] to the Company. There have been no response [to the] Cash Calls from you since in early 1993.
On that date, the following stock certificates were issued to Blackwell: Certificate No. 12 for 69 shares; Certificate No. 14 for 1 share; and Certificate No. 15 for 140 shares. According to Blackwell, these certificates represented purchases by her from the outstanding "cash call" offerings: 65 shares from the August 4, 1993 call, plus 5 additional shares for the "accumulated interest" on the prior loan; and, 140 shares from the April 10, 1994 call.
On May 26, 1994, the Bank tendered another $75,000.00 to Blackwell, representing the balance of the $150,000.00 loaned to her. She deposited in B&C Broadcasting, Inc.'s account $33,336.00 on May 26, 1994 and $36,664.80 on May 27, 1994. While Blackwell intended to keep $10,000.00 from the loan proceeds, she eventually advanced more than the borrowed amount to B&C Broadcasting, Inc. The record shows Certificate No. 16 for 140 shares was issued to Blackwell on May 26, 1994.
The first letter Blackwell received objecting to the April 10, 1994 "cash call" offering arrived after the noted stock issuances.[11] On May 27, 1994, Vera Foster addressed a letter to Blackwell stating in pertinent part:
There can not be a capital call unless there is a vote on the issue. Moreover, you can not issue stock to yourself without following proper procedures. You are a 12% shareholder and you can not, therefore, do what you have attempted. I appreciate your loan to the corporation and we are ready to do our part, however, we must do it properly.
I am aware that the license will soon expire unless we take the necessary steps in the very near future. We must, therefore, all work together. In this regard, I suggest that we have a meeting as soon as possible.
On July 11, 1994 Vera Foster and Linda Sue Crouch requested that Blackwell call a special meeting of the shareholders for the purpose of electing directors. A notice, signed by Crouch and Blackwell, was sent to all the shareholders advising them a special meeting would occur on July 30, 1994 followed immediately by a board meeting. The minutes of that meeting show John Wadsack, an attorney, appeared with Vera Foster's proxy and nominated a slate of candidates and Blackwell also nominated a slate for election to the *1212 Board. Mike Mitchell confirmed the minutes accurately reflected he advised Wadsack:
That since the existence of the corporation, it has been our practice whether written or not for the Secretary/Treasurer to issue notices of cash calls to existing stockholders based on their percentage of ownership in B&C Broadcasting. The shareholders has thirty (30) days [from] receipt of the letter to exercise his or her option. If [the] shareholders choose not to purchase the new shares of stock that is available, it is offered to the existing stockholders. Mrs. Blackwell has purchased her stock in accordance with the practices set forth by this corporation.
He further explained that he had been unable to purchase his stock and had it not been for Mrs. Blackwell being the only shareholder to continue purchasing shares, the whole project would be history now.
The minutes also recite: "Mr Wadsack thanked [Mitchell] for the detailed information. He further stated that if he had known this information before he came, it would have been helpful. He acknowledged that he understood that Mrs. Blackwell was the major stockholder." Blackwell declared her slate of candidates the victors and proceeded to convene a board meeting with the new members: Faye Blackwell, Linda Sue Crouch, Larry Bellow, and Mike Mitchell.
Although Crouch arrived late, she was present during the Board meeting. At the meeting, "[i]t was moved by Mr. Mitchell and seconded by Mr. Bellow to approve all actions past and present and to accept the budget presented. The motion passed." The station's budget listed under the heading "Payroll: General Manager......$5000.00 ..." Blackwell also served as the station's general manager. The total itemized monthly expenses were $23,513.60, in addition to a one time startup cost of $26,142.61. The Board then passed a resolution empowering Blackwell and Crouch "to seek finances for completion and operation of KZWA Radio Station FM. 105.3, Lake Charles, Louisiana." This resolution was signed by Bellow, Crouch, Blackwell, and Mitchell. The only funds, however, that were deposited in the Corporation's account for the months immediately prior to and following the resolution were secured by Blackwell. The record shows from May 29, 1994 to August 4, 1994, Blackwell deposited $17,000.00 in the Corporation's account to satisfy expenses. All the monies were derived from her separate funds. She attempted to perfect the loan for B&C Broadcasting, Inc., as authorized on July 30, 1994, but the bank refused to loan the Corporation any funds. It agreed, however, to loan Blackwell personally $25,000.00[12]; and, she in turn deposited the amount in the account of B&C Broadcasting, Inc. Blackwell also deposited $2,602.03 in B&C Broadcasting, Inc.'s account from November 11, 1994 to January 18, 1995; and paid between August and September, 1994 the following assets and services for the Corporation: Furniture $4,916.41; Two Computers $3,458,52; and Installation of Air-conditioner in tower $1,100.
During this period, the Corporation issued additional shares to Blackwell: Certificate No. 18 on July 8, 1994 for 5 shares; Certificate No. 17 on June 26, 1994 for 14 shares; Certificate No. 20 on July 25, 1994 for 13 shares; and Certificate No. 21 on August 4, 1994 for 3 shares.[13] Blackwell testified these purchases were all made from the 45 remaining April 10, 1994 "cash call" stocks.
The radio station now operated by B&C Broadcasting, Inc. has an estimated value *1213 of 2.5 million dollars and is rated by Arbitron as second in the local market. Vera Foster and Linda Sue Crouch have attempted to sell all but 48 shares of their alleged combined interest in the Corporation to an outside purchaser for $725,000.00, plus a retained 25% interest for twenty years in any future sale of B&C Broadcasting, Inc. for a sum greater than 1.2 million dollars. Vera Foster paid in cash $18,850.00 directly to the corporation for her shares; Crouch paid Henning $111,000.00 to purchase his shares; and Faye Blackwell paid in excess of $200,000.00 for her shares which was used by the corporation to construct the radio station. Each month she has continued to pay off the $175,000.00 loaned to her by Calcasieu Marine National Bank out of personal funds, except for three payments totaling $1,245.00 from the corporate account which Blackwell charged off as unpaid salary.

PROCEDURAL HISTORY
On October 6, 1994, Vera Foster and Linda Sue Crouch made a demand on Blackwell to inspect the books and records of the Corporation. Blackwell refused to allow the inspection. Foster and Crouch then filed an action pursuant to La.R.S 12:103(D) seeking a writ of mandamus authorizing their inspection of B&C Broadcasting's books and records. The writ was granted. After examining the books and records, Foster and Crouch sought a writ of mandamus ordering B&C Broadcasting, Blackwell (in her capacity as secretary/treasurer) and Larry Bellow (as president) to cancel the shares issued to Blackwell for her capital contributions. Blackwell, in turn, sought a writ of mandamus ordering the corporation to cancel certain shares of stock issued to Foster and Crouch. To maintain the status quo the court ordered that "no shareholder's board of director's meeting of B&C Broadcasting, Inc., shall be noticed or take place pending the hearing and this court's ruling on the petitioner's Writ of Mandamus." After trial, Judge Gregory Lyons, on March 6, 1996, issued a writ ordering B&C Broadcasting to cancel 385 shares of stock issued to Blackwell. Blackwell then moved for a new trial claiming the judgment rendered was contrary to the law and the evidence.
The Board scheduled a meeting for June 8, 1996 to ratify the issuance of 325 shares of stock to Blackwell for past capital contributions. Upon receipt of the letter informing them of the scheduled meeting, Crouch and Foster filed a petition for a temporary restraining order, and preliminary injunction, seeking to enjoin Bellow and Blackwell from noticing or holding any board of directors meeting and prohibiting them from issuing any new shares of stock until rendition of final judgment in the suit. They also, by amended petition, sought the issuance of a quo warranto writ directing Blackwell and Bellow to show by what authority they claimed their respective offices in B&C Broadcasting. Judge Lyons signed the order on June 7, 1996, a day before the scheduled Board meeting, enjoining Bellow and Blackwell from holding a Board meeting and issuing any shares of stock until a final judgment was rendered. But Blackwell and Bellow maintain they did not receive notice of the temporary injunction before the scheduled meeting. The meeting was held and subsequently, the Board authorized the issuance of 325 shares of stock to Blackwell.
After granting the injunction, Judge Lyons recused himself; and Judge Wilford Carter was assigned the case. He granted Blackwell's motion for new trial; and enjoined the Board from meeting or issuing any shares of stock pending the new trial.

ERRORS ASSIGNED
For reasons previously mentioned, the trial judge dismissed Vera Foster and Linda Sue Crouch's petitions for relief. Foster and Crouch now appeal this ruling and assign the following errors for review:
1. The trial court erred in holding that appellants have no cause of action.
2. The trial court erred in holding that appellants have no right of action.

*1214 3. The trial court erred in finding that the board of directors ratified the issuance of 385 shares of stock to Blackwell on June 8, 1996.
4. The trial court erred by failing to hold that Blackwell breached her fiduciary duty as an officer of the corporation.
5. The trial court erred in failing to make the Writ of Quo Warranto Peremptory forbidding Blackwell and Bellow from acting as officers of the corporation, Larry Bellow from acting as a director of the corporation and declaring that John Wadsack, Sue Crouch, and Faye Blackwell are the duly elected officers of the corporation.

ANALYSIS
Vera Foster and Linda Sue Crouch complain that all the "capital call" stocks issued to Faye Blackwell were defective because the Board "did not fix the time in which the existing shareholders could exercise their preemptive rights nor did the Board of Directors of B&C Broadcasting, Inc. fix the price and terms for subscriptions or the issuance or sale of any additional stock in B&C Broadcasting, Inc., as required by La.R.S. 12:52 and 12:72." They also contend Faye Blackwell's "capital call" stocks should be canceled because she breached a fiduciary duty owed to the shareholders when she failed to advise them that she obtained a loan from Calcasieu Marine National Bank and pledged corporate assets to secure it.
La.R.S. 12:52 specifies the consideration which must be given for issuance of shares in a corporation. This statute provided at the time relevant to this dispute:
A. Par value shares may be issued initially for such consideration expressed in dollars, not less than the par value thereof, as shall be fixed by the board of directors, Shares without par value may be issued from time to time for such consideration expressed in dollars as may be fixed by the board of directors or by the shareholders by a vote of a majority of the voting power present, if the articles reserve to the shareholders the right to fix the consideration provided however, the consideration for such shares may be initially fixed by the incorporators. Treasury shares may be disposed of by the corporation for such consideration as my be fixed from time to time by the board of directors. All fully paid shares shall be nonassessable.
B. Shares issued (1) in payment of a stock dividend, (2) pursuant to exercise of conversion rights, (3) in exchange for, or in respect of, outstanding shares pursuant to a reclassification of stock, or (4) in a merger or consolidation as provided in the merger or consolidation agreement, shall be considered as fully paid when so issued.
C. The consideration for shares issued otherwise than as stated in subsection B of this section, shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less than the dollar amount of the consideration fixed for the shares, before the shares are issued. Upon payment of the consideration fixed therefor, such shares shall be considered as fully paid. Cash consideration for shares may not be paid by the purchaser's note, secured or unsecured, or uncertified check; and in case of delivery of such a note or check in payment for shares, the shares shall not be issued until the note or check has been paid full.
D. Solely for the purpose of determining whether shares have been paid for fully, the valuation placed by the shareholders or the directors, as the case may be, upon the consideration other than cash paid therefor shall be conclusive.
The aim of this statute, as expressed by our brethren in Hibernia Nat. Bank v. Smith, 96-1106 (La.App. 1 Cir. 6/20/97); 697 So.2d 1051, writ denied, 97-2382 (La.1/9/99); 705 So.2d 1101, "is to prevent corporations from issuing stock without receiving *1215 full value and thereby diluting holdings of innocent stockholders and causing reliance by creditors on false or nonexistent capital resulting from the issuance of watered stock." See also, Haselbush v. Alsco of Colorado, Inc., 161 Colo. 138, 421 P.2d 113, 114 (1966).
The trial judge found all the stocks issued by B&C Broadcasting, Inc. were invalid from its inception until they were later ratified by the Board. The initial stocks, he found were invalid, because they were issued prior to the existence of B&C Broadcasting, Inc. and "without the corporation receiving one dime for its stocks." He declared all the stocks after incorporation of B&C Broadcasting, Inc., likewise, invalid because they were "issued illegally through a process of what plaintiffs and defendants refer to as capital calls made by [the Secretary/Treasurer] without approval of the Board." Finding Vera Foster and Linda Sue Crouch, thus, did not own any valid stocks in B&C Broadcasting, Inc., he held they were not entitled to "preemptive [or] quo warranto rights" and had no cause or right of action to petition the court for relief. However, appellants now argue the trial court's finding was erroneous because the shares they acquired initially from the Corporation were issued for valid consideration pursuant to a merger agreement between B&C Broadcasting Limited and Sabine Limited as provided by La.R.S. 12:52(B) and are considered fully paid.
Whether a merger as provided in La. R.S. 12:52(B) occurred when B&C Broadcasting Limited and Sabine Broadcast Limited decided to unite must be determined in accordance with the laws existing at the time. The Louisiana Supreme Court in McCarthy v. Osborn, 223 La. 305, 65 So.2d 776 (1953) in an extensive opinion stated:
`Under the Business Corporation Act, now incorporated as LSA-Revised Statutes 12:1 et seq., a merger of corporations is authorized but the term `merger' has a well recognized meaning in the courts. A merger of two corporation is formed by the stockholders placing their assets and liabilities into a common pool and forming one single corporate body wherein the interest of stockholders of the two corporations are retained in the newly created corporation.'
Quoting with approval from Cortland Specialty Company v. Commissioner of Internal Revenue, 60 F.2d 937 (2 Cir.1932), the Court also noted:
`* * * A merger of two corporations occurs when two corporations having a distinct body of stockholders desire to throw their assets and liabilities into a common pool and thereafter have their two enterprises operated and managed as one as incident to which reclassification and readjustment of capital structure may be involved.... A merger ordinarily is an absorption by one corporation of the properties and franchises of another whose stock it has acquired. The merged corporation ceases to exist, and the merging corporation alone survives. A consolidation involves a dissolution of the companies consolidating and a transfer of corporate assets and franchises to a new company. In each case interests of the stockholders and creditors of any company which disappears remain and are retained against the surviving or newly created company....'(Citations omitted).
It is clear to us that the dealings between the partners of B&C Broadcasting Limited and Sabine Broadcasting Limited constituted neither a valid "merger" by agreement nor a consolidation as ordinarily recognized by our courts and contemplated by the redactors of La.R.S. 12:52(B). This term was then reserved to define the union between two existing corporations and the attendant pooling of their respective assets and liabilities. Prior to the 1992 enactment of La.R.S. 9:3441, et seq., Louisiana law contained no provisions authorizing the merger of partnerships with business corporations. The new provisions now recognize mergers or consolidations by partnerships "with or into a domestic business or nonprofit corporation." *1216 La.R.S. 9:3442. Interestingly, these provisions require not only a "merger agreement" fully detailing the "basis of converting the interests" of the partners in commendam into shares of the new corporation; they require certification and filing of the agreement with the Secretary of State. Newly enacted La.R.S. 9:3446, relating to the effects of such mergers, also specifically states: "All property and assets of whatsoever kind ... and all debts due on whatever account to any of them, including ... promises to make capital contributions ... shall be taken and be deemed to be transferred to and vested in the surviving or new entity without further act or deed."
B&C Broadcasting Limited and Sabine Broadcasting Limited were partnerships formed by two groups interested in acquiring an FCC license to operate a radio station in the Lake Charles area. Neither group was incorporated in Louisiana at the time the so-called "merger agreement" was approved. It is well settled that "[a] partnership and a corporation are two different and distinct legal entities; the rights and obligations of a partner are not at all similar to the rights and obligations of a stockholder in a corporation." Monteleone v. Airey, 57 So.2d 257, 260 (La. App.Orl.1952).
B&C Broadcasting Limited consisted of two general partners (Carol Collins and Faye Blackwell) and two limited or in commendam partners (Ralph Frank and Vera Foster). La.Civ.Code art. 2840 provides:
A partner in commendam must agree to make a contribution to the partnership. The contribution may consist of money, things, or the performance of nonmanagerial services. The partnership agreement must describe the contribution and state either its agreed value or a method of determining it. The contract should also state the time or circumstances upon which the money or other things are be delivered, or the services are to be performed, and if it fails to do so, payment is due on demand.
A partner in commendam is liable for the obligations of the partnership only to the extent of the agreed contribution. If he does not make the contribution, or contributes only part of it, he is obligated to contribute money, or other things equal to the portion of the stated value that he has failed to satisfy. The court may award specific performance if appropriate.
The partners in commendam in this case agreed to advance to B&C Broadcasting Limited up to $350,000.00 to construct and operate a radio station. They also agreed to loan the partnership $150,000.00 for various fees which might be incurred in securing the FCC license. The record confirms B&C Broadcasting partners in commendam advanced only $70,000.00 to the partnership in partial satisfaction of their obligation. Vera Foster and Ralph Frank, thus, had not fully satisfied the financial obligation they undertook to furnish money to B&C Broadcasting Limited at the time they met to convert their interests in the partnership to shares in the new corporation. The general partnership, as well as third parties, had the right to demand the promised contribution from them. Darden v. Cox, 240 La. 310, 123 So.2d 68 (1960); Marshall v. Lambeth, 7 Rob. 471 (La.1844).
It is quite clear the 200 shares of common stock authorized in the April 19, 1991 agreement for the interests of the partners in B&C Broadcasting Limited and Sabine Broadcast Limited were not issued pursuant to a legal merger. It is also clear that the parties in interest have never attempted to effect a valid "merger" of the two partnerships with B&C Broadcasting, Inc, though the law now permits them to do so. Since the shares were not issued pursuant to a legal merger, La.R.S. 12:52 provides: "The consideration for shares issued otherwise ... shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less than the dollar amount of the consideration *1217 fixed for the shares, before the shares are issued."
The only cash mentioned in the April 19, 1991 agreement is the $75,500.00 "earlier" advanced by the "incorporating members" to buy Boss Action out of the FCC proceeding, and to place $500.00 "into a bank account for operating capital." None of the stated funds, except for $500.00, were actually "paid-in" for the additional 151 shares also authorized by incorporators in the agreement. The funds were advanced by the limited partners and used to buy-out Boss Action, prior to them meeting and agreeing to form a corporation. As noted by the trial judge, "the partnership, [B&C Broadcasting, Limited] received the FCC permit in 1992, then transferred it to B&C Broadcasting, Inc." The initial capitalization recited in the agreement, thus, was funded to and spent on behalf of the partnerships, not the corporation.
So that when the bucks are counted, the only legal consideration recited in the April 19, 1991 agreement actually used to capitalize the corporation and pay for the 251 shares authorized was $500.00. Nonetheless, we have said "nothing in the law or jurisprudence, prevents partners from exchanging their partnership interests for shares of stock in a corporation." Cook v. Gist, Methvin, Hughes, et al., 96-1361 (La. App. 3 Cir. 10/9/97); 702 So.2d 809. Partners may by unanimous consent terminate their partnership relationship. La.Civ. Code art. 2826. The evidence in this case convinces us the partners intended to terminate their partnership relationships when they met and unanimously consented to the April 19, 1991 agreement; and they further intended to continue their efforts to secure the FCC license as shareholders in a corporation. However, La.Civ.Code art. 2828 provides in part "[w]hen a partnership terminates, the business of the partnership ends except for the purposes of liquidation." Codal article 2835 also declares that "[t]he liquidation of a partnership is not final until all its assets have been collected and applied to its obligations and its remaining assets, if any, have been appropriately distributed to the partners." However, we have said when all the assets of a partnership are used to capitalize a new corporation, with the unanimous consent of the partners in exchange for shares of stock, the partnership is deemed liquidated. Cook v. Gist, Methvin, Hughes, et al., supra.; Monteleone v. Airey, supra.
At the time the agreement was consented to by the partners in this case, the only "things" B&C Broadcasting, Limited owned were incorporeal in nature the right to pursue its application for a radio permit before the FCC; and the general partners' right to demand contribution from the in commendam partners up to the pledged amount. Although the partners later transferred to the corporation the building permit issued to the partnership, the value of this incorporeal consideration was certainly inadequate to initially capitalize the operation of the corporation which stated purpose was to "build, operate and maintain a profitable radio station in the Lake Charles area."[14] While we are satisfied the partners intended to dissolve their partnership arrangement and effect a full liquidation of the partnership by converting their respective interests to shares in the new corporation, we are not at all convinced the general partners in B&C Broadcasting Limited intended thereby to release the in commendam partners from their obligation to capitalize the venture. Nothing in the April 19, 1991 agreement of the partners suggests that they did. All of the subsequent dealings of the former partners as shareholders moves us to conclude the contrary was so. They all knowingly and willingly adopted and continually ratified by their conduct and acquiescence, as shareholders and members of the Board of Directors, the same "cash call" method for raising capital to further the *1218 radio endeavor employed when they were general and in commendam partners.
Although Vera Foster and Crouch purchased shares from the "cash call" offering, they argue the method employed by the corporation to adequately capitalize its stated purpose was never formally approved by the Board. However, they seek to annul and cancel only the corporate shares issued to Blackwell, except the original 47 shares issued her following the so-called merger.
John Henning, as mentioned, testified when he needed money to pay corporate expenses he "always used cash calls." When the corporation was formed the $500.00 per share value was "picked ... because it was easier to work;" and Henning routinely notified the shareholders that certain expenses were outstanding and the particular stock offering was needed to satisfy the indebtedness. Vera Foster voiced no objection to the process employed until Blackwell acquired a majority of the corporation's shares. Crouch also admitted she initially voiced no objection to the "cash calls." Like her mother, Crouch simply "did not want to invest further" and ignored Blackwell's "cash calls."
It has long been held by courts in other jurisdictions that "a corporation or its stockholders may, by custom or general consent, waive the requirement of formal meetings of the board of directors." 18B AmJur 2d, Corporations, § 1450; Myhre v. Myhre, 170 Mont. 410, 554 P.2d 276 (1976); Remillong v. Schneider 185 N.W.2d 493 (N.D.1971); First Nat. Bank of Burns v. Frazier, 143 Or. 662, 22 P.2d 325. These "courts have consistently held that the directors of a close corporation may transact the corporation's business affairs informally, especially where informality has become customary." 18B Am.Jur.,Corporations, Id.; Rowland v. Rowland, 102 Idaho 534, 633 P.2d 599 (1981). The shareholders may even "authorize acts to be done by agents of the corporation," without a board of directors' meeting, or "ratify the acts already done, and thereby bind the corporation." Merchants' & Farmers' Bank v. Harris Lumber Co., 103 Ark. 283, 146 S.W. 508 (1912). This is so because the necessity for Board of Directors meetings is "for the benefit of the shareholders ...; they may waive the necessity of the meeting of the board for the transaction of the business within their corporate powers." Estes v. German National Bank, 62 Ark. 7, 34 S.W. 85 (1896). The court in Merchants' & Farmers' Bank, quoting with approval from 2 Morawetz, Private Corporations (2d Ed.) § 623, said: "If the shareholders who constitute the corporate association unanimously acquiesce in or ratify an act performed by an agent or board on behalf of the corporation, no further question as to the extent of the powers delegated to the agent or board can arise."
La.R.S. 12:52 simply requires that the board fix the quantity and price of no par shares before issuance. It does not mandate the members do so in any "formal meeting," or that their action must be acknowledged in the actual minutes of the corporation. See Wolf v. Erwin & Wood Co., 71 Ark. 438, 75 S.W. 722 (1903); Stiewell v. Webb Press Co., 79 Ark. 45, 94 S.W. 915 (1906). We agree with the trial judge that it is patently inequitable to allow the Fosters to capture the "potential windfall that may result" from the sale of B&C Broadcasting, Inc. by singling out as defective only the "cash call" sales of corporate stocks to Blackwell. The consideration used to purchase the shares initially acquired by Vera Foster and those later transferred to Crouch from Henning was wantonly inadequate to capitalize the corporation. The so-called merger of the partnerships with the corporation was invalid and never legally consummated. The partners could have perfected the merger prior to issuance of the undercapitalized stocks. Had they done so, the corporation would have acquired the right to demand that Vera Foster and Ralph Frank honor their promises to contribute to the extent they pledged to the in commendam partnership. La.R.S. 9:3446.
*1219 But even absent perfection of a valid merger, in this instance, when the partners by mutual agreement transferred the only assets of the partnership to the then undercapitalized B&C Broadcasting, Inc., we conclude it must have been intended that the corporation would take over the asset, i.e. "building permit," and the debt owed by the in commendam partners. To collect this debt, the new corporation, simply used the method employed by the former partners it continued to make "cash call" offerings to secure needed and promised capital from the old in commendam partners in amounts equal to their converted majority stock percentages.
All the Board members of B&C Broadcasting, Inc., except Crouch, testified the "cash call" offerings was the method they used to raise capital for the corporation and were it not for Blackwell's purchases of stocks from the "cash calls," the corporation would have failed. In the end, the shareholders would have been "out of the hunt," and their investments lost. Blackwell, at the behest of the Board members, repeatedly contacted the Foster family and diligently attempted to excite them into providing the promised capital by answering the cash call. Kent Foster actually promised the Board members that "the money would be sent soon;" but none ever arrived. Eventually, the Board authorized Blackwell to raise the money any way she could by buying the "cash call" stocks or offering them for purchase by outsiders. Though the Board members never recited their approval of the "cash calls" offerings on August 4, 1993 and April 10, 1994 in the minutes, we are satisfied they consented informally as a body to the price and quantity of the issuances and by practice authorized the corporation's secretary/treasurer to notify the shareholders and grant them opportunity to purchase shares in the percentages they held in the corporation. Vera Foster and Crouch never complained that the "cash call" method employed by the corporation well over 2½ years was invalid until Blackwell secured the majority interest in the corporation. We find, under these circumstances, they acquiesced to the offerings. Vera Foster, in fact, actually participated in what she now claims were unauthorized issuances when she purchased shares from prior "cash call" offerings.
Nothing in La.R.S. 12:52 or the jurisprudence prevents us from concluding the Board and the shareholders, by custom and general consent, authorized and ratified the now disputed "cash call" offerings. Vera Foster and Crouch had actual knowledge of the proposed sales and were given preemptive opportunity to purchase shares. They opted simply to ignore them without voicing any timely complaint to the Board members or other shareholders. It is certainly reasonable to find they impliedly at the very least acquiesced to the offering, though they may not have anticipated Blackwell would eventually purchase all the shares so offered. Our conclusion is buttressed by the holding in Ogden v. Culpepper, 474 So.2d 1346 (La.App. 2 Cir. 1985). In that case, the second circuit refused to invalidate a stock sale even though the Board of Directors was improperly constituted and the lone Board member lacked authority to "set the price" for the shares so issued. The court found the complaining shareholders had actual knowledge of the sale and by failing to voice any opposition to it, they ratified the sale and could not "now be heard to complain that the sale was not properly authorized and that [the purchaser] should not have been able to vote the stock he purchased" to elect a new Board of Directors. The shareholders' quo warranto action, thus, was dismissed.

BREACH OF FIDUCIARY DUTY
We also find Blackwell did not breach a fiduciary duty owed to the shareholders when she purchased the "cash call" stocks. It is true a fiduciary "cannot take advantage of [her] position for [her] personal benefit to the detriment of the corporation or its shareholders." Spruiell v. Ludwig, 568 So.2d 133, 141 (La.App. 5 *1220 Cir.1990), writ denied, 573 So.2d 1117 (La. 1991). She "must zealously ... guard and champion the rights of [her] principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent." Noe v. Roussel, 310 So.2d 806, 819 (La. 1975). But, transactions between a director or officer and a corporation is not voidable simply because of the relationship of the parties. La.R.S. 12:84 provides:
A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.

At the time Blackwell purchased the stock the corporation was barely hanging on-its creditors were threatening to sue, even the State was demanding immediate payment of certain tax liabilities, and it had not "a dime" as the trial court put it to construct the radio station by the new dateline already twice extended by the FCC. Vera Foster could have purchased the majority of the offered shares and make good her promise to capitalize the venture; but she opted to do and say nothing. Like her mother, Crouch could have purchased the stocks but she offered not one penny to save the failing corporation though she certainly knew all about its dire financial condition.
They now complain somehow Blackwell breached a fiduciary duty owed them as shareholders because she secured a loan without telling them and pledged the tower and transmitter listed in the corporation's name. The testimony clearly establishes Calcasieu Marine National Bank was unwilling to loan any money to the failing corporation-other than the debt owed by the in commendam partners, it owned nothing but a building permit seriously in jeopardy of revocation when the bank loaned Blackwell the needed capital collaterized by a mortgage on her rental and residential properties. The corporation had no money to acquire the transmitter or tower until Blackwell paid the purchase and construction price from the loans extended to her by the bank. The bank's loan officer testified he listed these items on the collateral documents because Blackwell intended to purchase them with the loan proceeds. We note only Blackwell's signature appears on the documents; no corporate resolution was ever attached authorizing the pledge of the tower, transmitter, or building permit. The appellants, however, have not sought to invalidate the collateral mortgage held by the bank to the extent it burdens property which they claimed was owned by the corporation and improperly mortgaged.
We must decide only whether Blackwell's purchases of the at issue "cash call" shares were fair to the corporation and the shareholders at the time. As mentioned, all the Board members and shareholders *1221 were notified of the particular offerings and were given opportunity to purchase shares equal to their percentages of stock ownership in the corporation. Without an immediate influx of capital, the failing corporation by all account would not have been able to "hold on" to the FCC building permit; and, its current 2.5 million dollars worth would never have materialized. To say Blackwell breached a fiduciary duty because she personally borrowed money to save the corporation from certain ruin makes no sense. She purchased the shares after repeatedly informing the shareholders that the corporation was in danger of losing its permit, followed by numerous attempts to secure the needed funding from the Foster family. Under the circumstances her purchases were fair to the corporation; and, thus, were not void or voidable as provided by La.R.S. 12:84.

CONCLUSION
After careful examination of the record, we hold the partners intended to end their partnership relationships and to proceed with the noted business venture as shareholders in a corporation. They transferred all the partnership assets to the corporation as well as the indebtedness owed by the in commendam partners. The corporation's stocks were issued from its inception without compliance with all the formalities provided in La.R.S. 12:52; but the Board members and shareholders either consented to or ratified the issuances. They acquiesced to the sales by their silence and actual acquisition of stocks from the "cash call" offerings.
When the Board met on July 30, 1994 and elected a new Board of Directors, the 65 shares purchased from the August 4, 1993 offering by Blackwell with funds owed her by the corporation and the 280 shares she acquired from the April 10, 1994 offering with the proceeds from the Calcasieu Marine National Bank loan were valid and properly counted. Foster's and Crouch's objection to these issuances arrived too late. For the reasons mentioned, they were neither void nor voidable. The new Board, with Crouch serving as a member, ratified "all actions past and present" of the corporation and its officers. We note Crouch, again, did not voice any objection at this board meeting; and, she joined the Board in passing a resolution authorizing her and Blackwell to "seek finances for the completion and operation" of the radio station. When the Board met on June 8, 1996, all the members except Crouch again ratified all the prior issuances to Blackwell. The temporary injunction issued by the trial court ordering the Board to stop and desist from conducting any meetings until a final judgment in the case was not served timely. The Board, thus, was not legally obliged to heed it. Airline Constr. Co., Inc. v. Ascension Parish School Board, 568 So.2d 1029, 1032 (La.1990). Further, the record is devoid of any evidence showing the members either agreed not to act as a Board on that date or they otherwise were aware that the injunction had been issued. Accordingly, we affirm the trial court's judgment dismissing the action to declare 385 shares of stock issued to Blackwell invalid and the quo warranto action. All costs of this appeal are assessed to appellants, Vera Foster and Linda Sue Crouch.
AFFIRMED.
AMY, J., CONCURS.
NOTES
[1] The agreement was written to comply with FCC guidelines and to assure favorable ruling on the group's application for the special "80/90" frequency-the FCC required assurance that the group's minority members controlled at least 21% ownership in the business venturer and that they were general partners in charge of the actual operation of the station.
[2] The Board's discussions focused on trying to find a location for the tower and transmitter and the costs required to put the station on the air. The members also briefly discussed paying Henning $300.00 weekly for his work.
[3] The Promissory Note signed by Ralph Frank, as President of B&C Broadcasting, Inc., provided the loan was "with interest at the rate of nine and one-half (9½) percent per annum from date, until paid."
[4] The record contains an undated memo, signed by Blackwell, which reads:

On January 10, 1994, we were granted two (2) extensions that would expire July 10, 1994.
In conversations to Mr. Metoyer and Mr. Bellow, we were concerned that the money for the project still seemed very uncertain. A real problem still existed concerning the August loan to the Company. Again, we were even more sure that outside investors would have to be sought.
The[y] directed me to again contact either the major stockholders or their counsel. I did so and was again assured that the money would be sent very soon.
The Board recommended that I proceed with the project by all means possible. They acknowledged that they didn't have the necessary funds to do so, but if they were within my reach, proceed.
[5] The minute further recited: "Mrs. Blackwell further stated that she would inform Mr. Mike Mitchell of the action and plans of the Board, since the other shareholders were very much aware of it through communications, but they seemed reluctant to respond...."
[6] We have not inserted the number of shares the stockholders were eligible to buy based on their percentage ownership interest.
[7] See fn. 6.
[8] Foster admitted she "[n]ever offered a proposal" as an alternative to Blackwell's plan; she "just sent an engineer down to help."
[9] The notes also state "[w]e were supposed to have a conference with all members at 4:00 p.m., but all attempts were futile." Vera Foster testified when the time came the call did not follow.
[10] Bartie confirmed when the loan was first considered, only Blackwell's income from her rental properties was used to determine the borrower's ability to repay the debt.
[11] As admitted by Foster and Crouch, though admitting they received the April 10, 1994 letter, they simply decided to ignore it.
[12] The loan, again, was secured by a mortgage on Blackwell's personal assets.
[13] Certificate No. 19 on July 13, 1994 was issued to John Buckley who loaned $500 to Blackwell for payment of the Corporation's debt. This sum was deposited in the Corporation's account on August 8, 1994. Neither Vera Foster nor Blackwell have sought to invalidate this issuance.
[14] The April 19, 1991 agreement specifically provides: "The purpose of the corporation is to build, operate and maintain a profitable radio station in the Lake Charles area."